DUFF L. GULA AND MARGARET GULA, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Gula v. Commissioner
Docket Nos. 15405-84; 15924-84; 16846-84; 18945-84; 20208-84; 20114-84; 21389-84; 21391-84; 21392-84; 26815-84
United States Tax Court
T.C. Memo 1989-486; 1989 Tax Ct. Memo LEXIS 489; 58 T.C.M. (CCH) 42; T.C.M. (RIA) 89486; September 6, 1989
*489 Ps claimed losses through partnerships which were to purchase lots from I. The losses consisted of advanced sales commissions and selling expenses of I's subsidiary which was to resell the lots at retail. The partnerships did not receive title to lots and no lots were identified as belonging to the partnerships as of the close of the taxable year in question. When schedules of the subject lots were provided to the partnerships, they were inaccurate and did not comport with the agreements between the parties. In general the partnerships and partner/investors (Ps) had no interest in the business activity, but were instead interested in tax benefits. Held, partnerships did not have profit objective. Held further, Ps not entitled to claimed losses. Held further, certain Ps liable for additions to tax under section 6653(a), I.R.C. 1954. Mitchell S. Fuerst, for the petitioners in docket Nos. 15405-84, 15924-84, 16846-84, 18945-84, 20208-84, 21389-84, 21391-84, 21392-84 and 26815-84. Alan E. Bandler, for the petitioners in docket No. 20114-84. William V. Spatz, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined the following deficiencies *490 in Federal income tax and additions to tax for 1980: Additions to tax:
Petitioners
Docket No.
Deficiency
Section 6653(a) [2]
Duff L. and Margaret
15405-84
$ 35,390.00
$ 1,769.50
Gula
Julian J. and
15924-84
38,320.00
1,916.00
Elizabeth Ferayorni
Milton and Hilda B.
16846-84
71,955.00
--
Werksman
Roger C. and
18945-84
40,388.85
--
Phyllis L. Zahn
Estate of Alan E.
20114-84
29,268.14
--
Kosh and June Kosh
Robert C. and
20208-84
40,893.61
--
Andree M. Zahn
Ronald I. and
21389-84
29,353.00
--
Gillian Ostrow
Harold S. and
21391-84
27,095.00
--
Paula Miller
Donald E. and
21392-84
65,458.00
--
Beverly Johnson
Vinod and Ranjan
26815-84
37,665.00
--
Patel
Petitioners Duff L. Gula, Julian J. Ferayorni, Roger C. Zahn, the decedent Alan E. Kosh, Robert C. Zahn and Ronald I. Ostrow, were partners in the partnership Mountain River Associates. Petitioners Milton B. Werksman, Harold S. Miller, Donald E. Johnson and Vinod Patel, were partners in the partnership Rivertop Mountain Associates. Mountain River Associates and Rivertop Mountain *491 Associates, each, in 1980, entered into a transaction to purchase from Investex, Inc., and its subsidiaries, the beneficial ownership of a number of lots of undeveloped land. Investex, Inc., was to select and identify the individual lots assigned to each partnership. As part of these transactions and under a representative agreement, Investex, Inc., and its subsidiaries were to resell all purchased lots for each partnership, before the end of 1980. The issues for decision are: 1. Whether each partnership, for Federal tax purposes, purchased and became the beneficial owner in 1980 of certain lots of real property; 2. whether each partnership properly accrued and deducted certain selling expenses and commissions which were attributed to the resale of its purchased lots; 3. whether the 1980 expenses deducted by each partnership were incurred in an activity engaged in for profit; 4. whether section 465 applies to limit each petitioner's deductions for 1980 because the partnership owned an intangible contractual right as opposed to an interest in real property; 5. whether certain petitioners (Gulas and Ferayornis) failed to report various items of nonpartnership income; and 6. whether *492 certain petitioners (Gulas and Ferayornis) are liable for an addition to tax under section 6653(a). FINDINGS OF FACT The parties' stipulations of facts and exhibits are incorporated by this reference. At the time of the filing of their respective petitions herein, petitioners and the decedent Alan E. Kosh resided at the following locations: Petitioners and Decedent Kosh
Residence
Gulas
Coral Springs, Florida
Ferayornis
Fort Lauderdale, Florida
Roger C. Zahns
Lighthouse Point, Florida
Koshes
Tamarac, Florida
Robert C. Zahns
Pompano Beach, Florida
Ostrows
Tamarac, Florida
Werksmans
Lake Worth, Florida
Millers
Boca Raton, Florida
Johnsons
Plantation, Florida
Patels
Plantation, Florida Each set of petitioners, for 1980, filed a joint individual income tax return. Each petitioner-husband and the decedent Alan E. Kosh, during 1980 became a partner in a partnership organized by Investex, Inc. The two partnerships involved in this case are Mountain River Associates (Mountain) or Rivertop Mountain Associates (Rivertop). All were either professionals, executives, or owners of their own businesses. Petitioner Duff L. Gula (Gula) is a doctor of osteopathy. He practices osteopathy as an employee of his professional *493 corporation, the Greater Fort Lauderdale Clinic of Bone and Joint Surgery, P.A. Petitioner Julian J. Ferayorni (Ferayorni) is a physician. He practices medicine as an employee of his professional corporation, Julian J. Ferayorni, M.D., P.A. Petitioner Roger C. Zahn and petitioner Robert C. Zahn are both executives with Zahn Builders, Inc. Their corporation is engaged in the land sale and construction business. The decedent Alan E. Kosh (Kosh) was an executive of his own firm, Kosh Opthamalic, Inc. Petitioners Ronald I. Ostrow (Ostrow) and Milton B. Werksman (Werksman) are attorneys. Petitioner Harold S. Miller (Miller) is a self-employed consultant. Petitioner Donald E. Johnson (Johnson) is an executive with General Accounts Services, Inc. His corporation is engaged in the business of furnishing collection agency services. Petitioner Vinod Patel (Patel) is a physician. Investex, Inc. Investex, Inc. (Investex), is a Florida corporation. In 1979, Investex's chairman and chief executive officer was Martin Rothman. Its senior vice president was Robert Birenbaum, who had previously been the president of another large land development company. Birenbaum had recently joined Investex *494 at Rothman's urging and was placed in charge of the company's planning and operations. Leonard Atlas, who was then Investex's vice president, was in charge of the company's sales and marketing. Also employed as a consultant to Investex was Michael Kramer. Kramer had an accounting degree and had worked for 2-1/2 years with a national accounting firm. Before becoming a consultant to Investex, he had worked as the vice president and chief financial officer for another land development company. Kramer became a full-time employee of Investex in late 1979 or early 1980. After joining the company, Kramer eventually became Investex's chief financial officer. A. Investex's Retail Land Sales Business. Since the early 1970's, Investex, through its various wholly owned subsidiaries, has been engaged in the land sales business. The land owned and acquired by Investex is developed and platted into saleable parcels or lots. The tracts of land which it has acquired for development and sale have been located in Florida and North Carolina. The subdivided lots are resold to retail purchasers who usually purchase the lots as vacation homesites or for other recreational use. From 1971 to 1974, *495 Investex and its subsidiaries almost exclusively engaged in selling individual lots to retail purchasers. Retail purchasers typically enter into agreements for deed allowing monthly payment for lots to Investex over an extended period -- usually about 10 years. The monthly payments included a financing or interest charge. Under the agreement for deed, Investex retained record title to the lot until the purchaser's payment obligation was fully discharged. Retail purchasers were not allowed to improve the lot without Investex's consent. Upon full payment, the purchaser received a deed to the lot. Should the purchaser default prior to fulfilling the payment obligation, Investex would then be free to cancel the contract and resell the lot. This type of retail land sale business conducted by Investex, caused cash operating deficits for a number of years prior to realizing profits on lot sales. Although Investex received the retail lot sales proceeds over a number of years, it nevertheless has substantial current operating expenses. These operating expenses included land acquisition costs, the costs of making required improvements to various developments, and sales and marketing expenses. *496 Selling expenses constituted the largest of Investex's costs. Investex utilized a variety of sales techniques to sell its lots. The retail sales commissions involved in lot sales, in some cases, exceeded 20 percent. Investex was required to pay retail sales commissions within a short time after a lot sale. Additionally, Investex's retail land sales business was subject to certain legal requirements, as well as to extensive regulation by state and Federal governmental agencies. Compliance with these statutory and regulatory requirements also added to Investex's operating costs. Under Florida law, a retail purchaser generally has a 30-day statutory period during which he may cancel his contract and have his money refunded. However in some instances, Investex allowed the buyer a cancellation period in excess of 30 days. For example, when the buyer was unable to visit and inspect the lot within the statutory 30 days, Investex might extend the time. Also, contracts entered into during the winter months usually provided for a longer cancellation period to enable the buyer to properly inspect his lot under appropriate weather conditions. Where a contract was entered into in November *497 or December, the buyer might be permitted a cancellation period for as long as 6 months. Prior to a developer offering lots for sale to the public, most states require registration of the development with a state regulatory agency. In Florida, the developer must register and obtain approval from the Florida state Division of Land Sales and Condominiums. After registration, the developer's activities remain subject to continuing supervision by the Florida Division of Land Sales. The developer is required to deposit a percentage of the receipts from his retail lot sales into a trust account to secure the construction of planned improvements to the development. A relatively small percentage of Investex's retail lot customers fully pay on their contracts and receive deeds to lots. Many agreements for deed are either cancelled or forfeited. A number of buyers elect to cancel their contracts and obtain refunds. Still others default and fail to make their monthly payments to Investex. Many defaults occur during the first year of the contract when a buyer typically would have less equity invested. Thereafter Investex may enter into one or more additional contracts to sell the same *498 lot until such time as a buyer does not cancel or forfeit. [3]
B. Investex's Bulk Sale Transactions. Beginning in 1975, in addition to its retail land sales, Investex made cash sales of lots in bulk to various partnerships. In a bulk sale transaction, Investex would sell the partnership a specified number of lots for cash. The partnership would enter into a nonexclusive representative agreement under which an Investex subsidiary was to resell the lots to retail customers. The Investex subsidiary would receive a substantial cash advance from the partnership and would also be entitled to a large percentage commission from retail sales collections. In contrast to its retail lot sales, the bulk sale transactions to partnerships and others generated large amounts of immediate cash and profits for Investex. By Investex's fiscal year 1979, most of the cash generated in its operations was from bulk sale transactions. Investex would sell lots in bulk for a cash price equal to four or five times its cost *499 for the land. Additionally, it would retain a substantial portion, in some cases as much as 70 percent, of the collections made on retail lot sales for the bulk purchasers as commissions. The Consolidated Statement of (Investex and its subsidiaries) Sources and Uses of Cash for the fiscal year ended June 30, 1979, (contained in Investex's annual report to the Securities and Exchange Commission) reflects total cash receipts from their operations of $ 2,803,820. Of the $ 2,803,820, $ 1,561,654 was from bulk land sales and $ 777,006 was from collections on commissions receivable. During the period 1980 through 1982, Investex engaged in bulk sale transactions with a number of individuals, partnerships, and other entities. Investex maintained 51 accounts reflecting various individuals, partnerships, and entities with whom Investex had entered into a bulk sale transaction. The partnership transactions were generally for larger amounts than the nonpartnership transactions. The partnerships were substantially composed of accounting clients of Schneider, Hirschhorn and Poole, described below, or Milton Sadoff (a certified public accountant practicing in the Miami, Florida, area). Petitioners' *500 Introduction to Their Partnerships
Schneider, Hirschhorn and Poole, P.A. (Schneider, Hirschhorn), was an accounting firm with offices in Plantation, Florida. The members of the firm were Alan Schneider, Irwin Hirshhorn, and Keenan Poole, each of whom was a certified public accountant. Schneider, Hirschhorn were the accountants for Gula, Ferayorni, Kosh, Ostrow, Werksman, Miller, Johnson, and Patel. Roger C. Zahn and Robert C. Zahn were not clients of Schneider, Hirschhorn, but had been introduced to Irwin Hirschhorn by the Zahns' company accountant. Schneider, Hirshchorn sent individual letters, dated March 5, 1980, or March 10, 1980, to Werksman, Miller, Johnson and Patel, soliciting their investment in the Rivertop partnership offering. The letter to each stated: We are in the process of arranging a new retail land sales investment opportunity (with significant tax advantages) for 1980, for those of our clients that were unable to take advantage of similar investments in previous years. As you know, we have been involved with the formation of this type of investment for the past five years, and they have been uniformly successful in meeting targeted objectives. The investment *501 can be summarized as follows: A partnership is formed to acquire a beneficial interest in land in North Carolina and/or upstate Florida, and enters into an agreement with the sales agency firm (from whom the land was acquired) to develop amenities and sell the land, in lots, on the installment basis. The partnership will sell its land by December 31, 1980. The investment is structured as to produce a tax write-off of approximately 3.4:1 in 1980. Each letter also contained a projection of the estimated tax savings and financial benefits to each individual petitioner based upon a hypothetical investment in the partnership. The projection contained the assumption that each petitioner would be in the 50-percent tax bracket. The amount of the hypothetical investment used in each letter varied, depending on the petitioner. The letters to Werksman and Johnson illustrated a $ 30,000 investment; the letter to Patel illustrated a $ 20,000 investment and the letter to Miller illustrated a $ 15,000 investment. [4]
Each *502 letter stressed that the petitioner's investment in the partnership would reduce his 1980 taxes by an amount equal to three and one-third times the amount of his cash investment, and would produce an ultimate after-tax profit at the end of 10 years equal to 15 percent of his cash investment. The letters to Werksman, Miller, Johnson, and Patel concluded by urging the petitioner to contact Schneider, Hirschhorn to learn more about the investment. The record also contains the letters sent by Schneider, Hirschhorn to Gula, Ferayorni, and Ostrow, who subsequently became partners in Mountain, concerning the Mountain partnership offering. Each letter, dated June 19, 1980, is virtually identical to the March 5 and March 10 letters which were sent to Werksman, Miller, Johnson, and Patel. The real estate partnership offerings discussed in the above letters to petitioners from Schneider, Hirshchorn were those from Investex. Rivertop Offering Materials
An offering memorandum, dated March 14, 1980, was given to potential investors in the Rivertop partnership. Various sample agreements and documents were included in these offering materials. A. Partnership to Be Organized. The March 14, 1980, *503 Rivertop offering memorandum includes the following: (1) The partnership would be organized upon the completion of the offering; (2) the partnership would be a general partnership under Florida law; (3) it would have up to 25 partners, each of whom would purchase his partnership unit or interest for $ 20,000 cash; (4) the general management of the partnership's business and the day-to-day conduct of its activities would be delegated to a single managing partner; (5) no regular meetings of the partnership would be required, although a meeting could be called at any time by the managing partner or upon the request of partners owning more than 25 percent of the interests in the partnership; (6) the address for the partnership's principal offices would be the same as the Schneider, Hirschhorn accounting firm; (7) the $ 500,000 contributed by the partners would constitute the total initial capital of the partnership; and (8) the partnership's profits and losses would be allocated equally among the 25 partners, and each partner would be allocated 4 percent of the partnership's profits and losses. B. Rivertop's Transaction. The offering memorandum contained the statement that the partnership *504 was to acquire a "beneficial interest" in approximately 212 lots at three different locations. The 212 lots were to be resold, during 1980, ostensibly to retail customers by an Investex subsidiary on behalf of the partnership. The 212 lots were to consist of the following: 98 lots covering approximately 81 acres of undeveloped land in Chimney Rock Township, Rutherford County, North Carolina, which were part of a development known as the Riverbend Tract; 81 lots covering approximately 29 [5] acres of undeveloped land in Unit 7 of Oakwood Hills, in Walton County, Florida; and 33 lots covering approximately 24 [6] acres of undeveloped land located in Creston Township, Ashe County, North Carolina, which were part of a development known as the Three Top Mountain Tract. The offering materials stated that Rivertop would be the beneficial owner of the 212 lots. The "beneficial interest" Rivertop acquired *505 would include the partnership's right to obtain title to the 212 lots, to sell its rights to purchase the lots in whole or in part, and to have such other benefits as its lot sales agreement with Investex provided. The tax opinion, which was included in the offering materials, contained the conclusion that the partnership would be the beneficial owner of the lots for tax purposes. [7] *506 The sample representative agreement, for resale of the 212 lots, contained the statement that "the beneficial owner [partnership] therein hereby grants to [the Investex subsidiary] the nonexclusive right to sell the real property * * *." Under the proposed agreement (contained in the offering materials) for lot sales to Rivertop, the partnership would purchase its 212 lots in the three tracts from two Investex subsidiaries for a cash price of $ 260,000. The individual lots acquired were to be described in an exhibit attached to the sales agreement. The $ 260,000 purchase price was to be allocated among lots in *507 the three tracts as follows: (1) $ 162,500 to the 98 lots in the Riverbend tract; (2) $ 65,000 to the 81 lots in the Oakwood Hills, Unit 7 tract; and (3) $ 32,500 to the 33 lots in the Three Top Mountain tract. All of the Rivertop's lots were to be resold before December 31, 1980. The partnership would employ an Investex subsidiary to sell its 212 lots under a nonexclusive representative agreement. This subsidiary would receive a $ 240,000 cash advance for its operating costs and be entitled to substantial commissions on any partnership lots sold. The commissions would exceed 66 percent of the aggregate price for which the partnership's lots were resold. As structured, these commissions would be paid only out of the collections the subsidiary made from buyers of the lots, unless the partnership terminated the nonrepresentative sales agreement. [8] *508 The offering memorandum included the statement that Investex and another of its subsidiaries would enter into an agreement to guarantee the performance of obligations owed Rivertop with respect to the purchased lots. C. Rivertop Transaction - Projected Tax Benefits. As discussed in the offering materials and in the March 5 and March 10 letters sent by Schneider, Hirschhorn to the Rivertop petitioners, substantial 1980 tax losses in excess of the partners' cash investment would be generated by the partnership's transaction. Rivertop, for tax purposes, reported its income and deductions under an accrual method of accounting. The partnership's gain on the resale of the lots would be reported under the installment sale method provided for under section 453. Large 1980 deductions would result chiefly from accrual of the large commissions payable to the Investex subsidiary responsible for reselling the partnership's lots before the end of 1980. While such commissions would be accrued and deducted for 1980, *509 payment would only be made from the resale proceeds, when collected. The tax opinion contained the explanation that a "dealer" in real estate may report its sales income under the installment method for tax purposes and may also currently deduct its selling expenses. D. Investex Developments in Which 212 Lots Located. The offering memorandum described the three Investex developments in which the partnership would be purchasing its 212 lots. The Riverbend tract consists of 1,500 platted lots covering approximately 1,266 acres of undeveloped land in northwestern North Carolina in the Blue Ridge Mountain region. The land is well-timbered and there are two man-made lakes of approximately 40 acres and 20 acres within the tract. The tract is located about 6 miles from the town of Lake Lure, which has a population of 3,250. While roads to provide access to lots within the development were planned, no roads had yet been built. The Riverbend tract had been acquired by an Investex subsidiary from various third parties. The tract was thus encumbered by various mortgages which Rivertop, as purchaser, would take subject to. The Oakwood Hills, Unit 7 tract consists of 918 platted homesites *510 and commercial parcels covering approximately 340 acres of undeveloped land in northwestern Florida near DeFuniak Springs, Walton County, Florida. Seven man-made lakes, ranging in size from 2 to 10 acres were planned, along with roads to provide access to individual lots within the tract. The planned roads had not yet been completed, although some of the road sites had been cleared. In 1978, an Investex subsidiary entered into an agreement for deed to acquire 221 lots in the tract from a partnership known as Oakwood Hills Estate. Record title to the lots remained with Oakwood Hills Estates, and Rivertop in purchasing the beneficial interest in 81 of the lots would take their interest subject to the payment obligation owed to Oakwood Estates partnership. While not disclosed in the offering memorandum, all three members of Schneider, Hirschhorn were partners in Oakwood Hills Estates. Also a partner in Oakwood Estates was Zale Bernstein, petitioners' former counsel in this present case. See footnote 17, infra. Previously, Oakwood Estates had engaged in a bulk sales transaction with Investex. Some of the Oakwood Estates' lots could not be resold to third-party retail purchasers *511 and the lots were sold back to the Investex subsidiary. The Three Top Mountain tract, the last of the three developments, consists of 852 platted lots covering approximately 555 acres of undeveloped land in northwestern North Carolina in the Appalachian Mountains region. The land is well-timbered and located in a sparsely populated area. Roughly 20 percent of the roads providing access to lots in the development had been completed. In 1978, an Investex subsidiary acquired title to the tract from various third parties. The land was subject to a deed of trust in favor of these third parties which Rivertop would take subject to when lots were purchased. E. Additional Conditions to Offering and Stated Uses of Proceeds. The offering memorandum included the statement that Schneider, Hirschhorn was Rivertop's named offeree representative. Investex also reserved the right to proportionately reduce the size of the partnership offering and to sell fractional partnership units. A minimum of eight partnership units, however, were to be sold. In the event that less than the planned 25 units were sold, the number of lots purchased by the partnership would proportionately be reduced. In accord *512 with the offering memorandum, the Rivertop offering proceeds would be used as follows: Cash down payment on 212 lots
$ 260,000
Payment to Investex subsidiary for
costs and sales representatives
240,000
Gross cash offering proceeds
$ 500,000
Rivertop's Formation and Agreements with Investex
A. Partnership's Formation. Investex was able to obtain only $ 190,000 of its planned $ 500,000 of subscriptions set forth in the Rivertop offering. Among the subscribers were petitioners Werksman, Miller, Johnson, and Patel. Werksman purchased a $ 35,000 or 18.4212-percent interest in the partnership; Johnson a $ 30,000 or 15.7895-percent interest; Patel a $ 20,000 or 10.5263-percent interest; and Miller a $ 15,000 or 7.8947-percent interest. Each partner at various dates on or before April 11, 1980, paid cash for his partnership interest. Irwin Hirschhorn selected another of the subscribers, Stanley Frankowitz, to serve as Rivertop's managing partner. Frankowitz was a doctor of osteopathy with his own practice. Hirchhorn advised Frankowitz that being managing partner would require him to sign appropriate documents on behalf of the partnership and to be responsible for keeping the partnership's records. *513 A written partnership agreement, lot sales agreement, and representative agreement were prepared. The agreements were similar to those provided with the offering materials. The figures in the agreements were proportionately less to account for the reduced capital contribution of $ 190,000 and the acquisition of fewer lots. No list of the specific lots acquired were included or attached to any of the agreements at the time of their execution. B. Rivertop Partnership Agreement. The partnership agreement indicated that the partners -- Werksman, Johnson, Patel, Miller, and six other named individuals -- under the name of Rivertop had entered into a contract for the purchase of real property at the following three locations: In the Riverbend tract; in the Oakwood Hills, Unit 7 tract; and in the Three Top Mountain tract. The realty was to be more fully described in an Exhibit A, attached to the partnership agreement. The partnership was to engage in the business of owning, developing, and selling such land or beneficial interests in lots of such land to third persons. Stanley Frankowitz was named as Rivertop's managing partner. The partnership agreement indicated that Rivertop would *514 make a contract to have an Investex subsidiary develop and resell the partnership's lots. No partner was to devote full time to Rivertop's business. Werksman, Johnson, Patel, and Miller each signed the written partnership agreement on or before May 5, 1980. Contrary to what the agreement stated, no exhibit listing or describing the specific lots to be acquired by Rivertop had been prepared or was actually attached to the partnership agreement at the time each of the four signed the document. C. April 16, 1980, Lot Sales Agreement. In a lot sales agreement dated April 16, 1980, Rivertop agreed to purchase, for $ 100,000 from two Investex subsidiaries, real property located in the Riverbend tract, the Oakwood Hills, Unit 7 tract, and the Three Top Mountain tract, all of which was to be described in an Exhibit A to be attached to the agreement. No Exhibit A or other list of specific lots was attached to the sales agreement at the time of its execution. The sales agreement further stated the $ 100,000 purchase price for the lots was to be allocated as follows: $ 62,500 to the lots acquired in the Riverbend tract, $ 25,000 to the lots acquired in the Oakwood Hills, Unit 7 tract, and *515 $ 12,500 to the lots acquired in the Three Top Mountain tract. Each of these allocations were initialed by the three individuals who signed the agreement -- Stanley Frankowitz on behalf of Rivertop, and Martin Rothman and Leonard Atlas, Investex's president and vice president, respectively, on behalf of the two selling Investex subsidiaries. Copies of the existing mortgages encumbering the lots were not attached to the lot sales agreement, contrary to statements in the agreement. The Investex subsidiaries agreed to pay such mortgages. Upon closing on the purchase of the lots, the lot sales agreement required Rivertop and one of the selling Investex subsidiaries to enter into a representative agreement. Under the representative agreement, the subsidiary would have the right to sell the lots to retail purchasers under the terms and conditions specified in such agreement. Rivertop also agreed that its interest in the lots would be subordinated to the rights of the retail purchasers to whom the lots were subsequently resold. The lot sales agreement provided that all notices to Rivertop were to be sent by mail, in care of Schneider, Hirschhorn, to the accounting firm's Plantation, Florida, *516 address. D. April 16, 1980, Representative Agreement. In a nonexclusive representative and development agreement, dated April 16, 1980, Rivertop granted an Investex subsidiary the nonexclusive right to sell the lots. All the lots were to be resold by the Investex subsidiary by December 31, 1980. The parties agreed the lots had a retail value equal to a $ 600,000 cash price or an $ 875,000 time price (which was defined to be the number of payments multiplied by the monthly payment, plus down payment). The Investex subsidiary was responsible for making all improvements to the lots required by the contracts entered into with third-party lot purchasers or by appropriate governmental agencies. The representative agreement for the resale of Rivertop's lots was signed by Stanley Frankowitz on behalf of Rivertop and by Leonard Atlas, Investex's vice president, on behalf of the Investex subsidiary. Contrary to a statement in the representative agreement, no exhibit was attached listing Rivertop's specific lots which were to be resold. The Investex subsidiary, in exchange for its services under the representative agreement and to defray its operating expenses, was to receive a $ 90,000 *517 cash payment from Rivertop at closing. The subsidiary was also entitled to commissions equal to 15 percent of the cash price under each retail sale contract (including the down payment), plus 66 percent of the balance of the time price. The agreement defined the cash price to be the amount shown on the individual contract before adding the time price differential. The agreement indicated that commissions would be deemed accrued in full and be considered fixed and determinable upon the making of a "completed sale." A "completed sale" was defined as one where a contract was signed by a bona fide third-person purchaser, and the full down payment in "cleared funds" had been received and approved by the partnership. Any discount or subsequent reduction in the retail sales price for a lot, however, would be borne proportionately by Rivertop and the subsidiary. The Investex subsidiary was to deposit all lot sales proceeds it collected into a trust account. On the 15th day of each month it was to submit copies of all contracts of sale executed during the previous month, along with a statement of account reflecting all the lot sales made to date and any resulting debits or credits. Each *518 quarter the subsidiary was to pay over all sums due Rivertop after deducting the commissions due it in the statement of account submitted to the partnership. For the first 3 years of the agreement, however, the amounts paid Rivertop under these provisions were not to exceed certain stated maximum amounts. The stated maximum amounts were $ 2,000 per month for the first year, $ 2,500 per month for the second year and $ 3,000 per month for the third year. If a retail lot sale contract was cancelled, the Investex subsidiary would have 12 months to resell the lot. The subsidiary upon successfully reselling the lot, would be entitled to commissions at the same rate discussed above. Any commissions the subsidiary received on the prior sale would not have to be repaid to the partnership, unless a refund was made to the lot purchaser. The partnership, however, would have no further liability for any accrued but unpaid commissions on the cancelled sale. The representative agreement would continue in effect unless terminated due to any of the following three events: (1) The sale of all of Rivertop's lots and the distribution to the partnership of its full share of the sales proceeds; (2) the *519 Investex subsidiary's failure to initially sell all the partnership's lots by December 31, 1980, or to perform its obligations under the agreement; or (3) the bankruptcy or imposition of a receivership on either the subsidiary or the partnership. All notices to Rivertop under the agreement were to be mailed, in care of Schneider, Hirschhorn, to the accounting firm's Plantation, Florida, office. E. Guarantee to Rivertop. In a guaranty agreement, dated April 16, 1980, Investex and another of its wholly owned subsidiaries guaranteed the proper performance of the obligations owed to Rivertop concerning the Riverbend, Oakwood Hills, and Three Top Mountain lots, including but not limited to those obligations under the sales and representative agreements. Investex and its subsidiary also guaranteed the performance of any future obligations which the subsidiary, serving as representative, might incur on behalf of the partnership. Mountain Offering Materials
The Mountain offering materials, including the offering memorandum which was dated June 24, 1980, were similar to the Rivertop offering materials. Investex had planned to raise less capital from the Mountain offering and was to have *520 fewer lots purchased by that partnership. Mountain was to be a Florida general partnership with 20 partners, each of whom was to pay $ 20,000 for his unit or interest in the partnership. Thus $ 400,000 represented the total initial capital contributed by the 20 partners. Profits and losses were to be divided equally among the 20 partners. The general management and conduct of the partnership's day-to-day business would be delegated to a managing partner. The partnership would have its principal offices at the same address as that of the Schneider, Hirschhorn accounting firm. Mountain was to purchase the "beneficial interest" in 125 lots covering approximately 110 acres located in the Riverbend tract. The term "beneficial interest" was defined in the same manner as in the Rivertop offering materials. According to the Mountain tax opinion, the partnership was to be considered the beneficial owner of the lots for tax purposes. The partnership would also enter into a nonexclusive representative agreement to have the 125 lots resold by an Investex subsidiary before December 31, 1980. The discussion of the tax benefits from the proposed transaction was virtually identical to the discussion *521 contained in the Rivertop offering materials. The partnership would report its income and deductions under an accrual method of accounting. Income from lot sales would be reported on the installment sales method as provided in section 453. The partnership would generate large deductions for 1980 by accruing the commissions owed on the potential resale of the 125 lots. Schneider, Hirschhorn was named as Mountain's offeree representative. Investex reserved the right to reduce the size of the offering and to sell partial partnership units. A minimum of six units were, however, to be sold. In the event that less than the planned 20 partnership units were sold, the number of lots purchased by the partnership would be proportionately reduced. The Mountain offering proceeds were to be used for the following stated purposes: Cash down payment on 125 lots
$ 215,000
Payment to Investex subsidiary for costs
and sales representative's expenses
177,000
Offeree representative fee
8,000
Gross cash offering proceeds
$ 400,000
Mountain's Formation and Agreements with Investex
Investex obtained subscriptions to only $ 298,000 of the $ 400,000 Mountain partnership offering. Among the subscribers were Gula, *522 Ferayorni, Roger C. Zahn, Kosh, Robert C. Zahn, and Ostrow. Gula purchased a $ 15,000 or 5.03-percent interest in the partnership; Ferayorni a $ 17,000 or 5.71-percent interest; Roger C. Zahn a $ 20,000 or 6.71-percent interest; Kosh a $ 17,000 or 5.71-percent interest; Robert C. Zahn a $ 20,000 or 6.71-percent interest; and Ostrow a $ 15,000 or 5.03-percent interest. Gula, Ferayorni, Roger C. Zahn, Robert C. Zahn, and Ostrow, on various dates on or before July 17, 1980, each paid cash for his partnership interest. Keenan Poole chose another of the subscribers, his friend Brian Sayer, to be Mountain's managing partner. Sayer is a practicing physician. Poole advised Sayer that being managing partner would involve very little beyond signing a few checks. A written partnership agreement, lot sales agreement, and representation agreement were prepared and were generally in accord with those attached to the Mountain offering materials and also similar to those used in the Rivertop transaction. Investex and another of its subsidiaries guaranteed the performance of any obligations owed to Mountain with respect to purchased lots. No list of the specific lots acquired by Mountain were included *523 or attached to any of the agreements at the time of their execution, although referred to as attached in each such document. The partnership agreement, dated July 17, 1980, indicated that the partners -- Gula, Ferayorni, Roger C. Zahn, Kosh, Robert C. Zahn, Ostrow, and 10 other named individuals -- under the name of Mountain had entered into an agreement to purchase real property located in the Riverbend tract. The partnership was to engage in the business of owning, developing, and reselling such land or beneficial interests in lots of such land to third persons. Brian Sayer was named as Mountain's managing partner. In a lot sales agreement, dated July 17, 1980, Mountain agreed to purchase from an Investex subsidiary real property located in the Riverbend tract for $ 160,000 cash. All notices to Mountain under the lot sales agreement were to be sent, in care of Schneider, Hirschhorn, to the accounting firm's Plantation, Florida, address. In a nonexclusive representative and development agreement dated July 17, 1980, Mountain granted an Investex subsidiary the right to resell Mountain's lots as the partnership's representative. All of the lots were to initially be resold by December *524 31, 1980. The parties agreed the lots had a retail "cash value" of $ 940,000 or a $ 1.375 million "time price." The Investex subsidiary undertook the responsibility of making all improvements to the lots required by the contracts with third-party lot purchasers or by appropriate government agencies. In exchange for its services, the subsidiary would receive at closing $ 177,000 cash from the partnership to defray its operating expenses. It would further be entitled to commissions equal to 15 percent of the cash price under each lot sale contract, plus 66 percent of the balance of the time price. All collections made on lot sales were to be deposited by the Investex company into a trust account. By the 15th of each month, it was to submit to Mountain copies of all contracts of sale executed in the preceding month and a statement of the partnership's account. Each quarter the sales representative was to pay all sums due to Mountain, but retain the commissions to which it was entitled to in the quarterly statement of account submitted to the partnership. The stated maximum amounts Mountain was to receive during the agreement's first 3 years were: $ 3,300 per month the first year; *525 $ 3,600 per month the second year; and $ 4,800 per month the third year. The Mountain representative agreement contained provisions concerning cancellations, resales, and termination of the agreement, identical to those in the Rivertop representative agreement. All notices to Mountain under the agreement were to be sent, in care of Schneider, Hirschhorn, to the accounting firm's Plantation, Florida, address. Schedules of the Specific Lots Each Partnership Purchased, the 1980 Investex Monthly and Annual Reports to the Partnerships, and the 1980 Agreements for Deed of Lots Sold to Third Parties
A. Lot Schedules . Lot schedules specifying the individual lots acquired by each partnership were not included with or attached to the respective partnership agreements, lot sales agreements, and representative agreements at the time of their execution. The parties have stipulated that the schedule, contained in Appendix A of this opinion, lists the specific and only lots which petitioners contend were purchased by Rivertop under its April 16, 1980, agreements with Investex. [9] The schedule contains a list, by section number and lot number, of 67 lots, 43 of which are located in the Riverbend *526 tract and 24 of which are located in the Oakwood Hills, Unit 7 tract. While petitioners claim Investex created and furnished a schedule of these 67 lots to Rivertop no later than June 30, 1980, the list was actually created and furnished to the partnership after 1980. The parties have stipulated that the schedule, contained in Appendix B of this opinion, lists the specific and only lots which petitioners contend were purchased by Mountain under its July 17, 1980, agreements with Investex. [10] The schedule contains a list, by section number and lot number, of 102 lots, all of which are located in the Riverbend tract. While petitioners claim Investex created and furnished a schedule of these 102 lots to Mountain no later than September 30, 1980, the list was created and furnished to the partnership after 1980. B. Investex Monthly and Annual Reports. Investex prepared monthly reports on the retail transactions involving the lots it had ostensibly sold to and had agreed to resell for each partnership. In the reports, *527 each lot transaction was identified by a five digit contract number. The first two digits of the contract number denotes a specific partnership. Rivertop's contract numbers begin with 48. Similarly, Mountain's contract numbers begin with 68. The last three digits of the contract number are sequential and reflect the chronological order a transaction was recorded for a partnership. For example, the first Rivertop transaction is designated by the number 48000, the second is designated 48001, and so on. The contract number assigned retail transactions should have appeared on the agreements for deed between Investex and retail lot purchasers. The monthly reports include information on each retail transaction including the gross amount, down payment, any subsequent payments, and current and prior month unpaid balances. The monthly reports do not identify the purchaser or the specific lot or lots involved in the transaction. Investex also prepared an annual time price report as of December 31, 1980, for each partnership. The annual report lists and summarizes all of the 1980 retail transactions for each partnership. The report provides the time/price, total collections to date, collections *528 for the report year, and the present outstanding balances due for each individual transaction. The 1980 Rivertop report reflected 50 active transactions, as of December 31, 1980. Of these 50 active transactions, with a cumulative time/price of $ 988,601.38, it was reported that there was $ 62,805.16 of collections to date, $ 48,451.16 of collections for the year, and $ 925,796.22 of unpaid balances. The 1980 Rivertop report also reflected 25 cancelled transactions. On these 25 cancelled transactions, with a cumulative time/price of $ 237,772.50, it was reported that there was $ 9,467.00 of total collections to date, $ 8,867.00 of collections for the year, and $ 228,305.50 of unpaid balances. The 1980 Mountain annual report reflected 104 active transactions as of December 31, 1980. Of these 104 active transactions, with a cumulative time/price of $ 1,445,806.83, it was reported that there was $ 105,881.83 of collections to date, $ 105,881.83 of collections for the year, and $ 1,339,929 of unpaid balances. The 1980 Mountain report reflected 20 cancelled transactions. Of these 20 cancelled transactions, with a cumulative time/price of $ 224,461.50, it was reported that there was *529 $ 10,000 of total collections to date, $ 10,000 of collections for the year, and $ 214,461.50 in unpaid balances. C. 1980 Agreements for Deed. 1. Rivertop agreements for deed. Appendix C [11] *530 of this opinion, summarizes certain pertinent aspects of the Rivertop retail lot sales contracts that petitioners contend were transacted during 1980. Of 75 retail sales transactions reported in the 1980 annual report furnished to Rivertop, the parties have introduced only contract documents for 63 transactions into evidence. In each contract, the Investex subsidiary is shown as the seller of the real property. The only identification of Rivertop is a contract number which appears in the upper right hand corner of each document's first page. These contract numbers would have been affixed to the contracts after they were executed by the retail lot purchasers and following acceptance by Investex. The 63 transactions involve the sale of Riverbend lots. The Rivertop petitioners have subsequently admitted that their partnership neither acquired nor resold any lots in the Oakwood Hills, Unit 7 tract. Of the 63 transactions, 27 are for the sale of 44 Riverbend lots, none of which are among the 67 lots petitioners contend were assigned to Rivertop on or before June 30, 1980. [12] The contracts in these 27 transactions were accepted by Investex on various dates over the period from May 23, 1980, to December 18, 1980. Most of these 27 discrepant transactions are retail transactions which were cancelled in 1980 and 1981. The eight agreements for deed with the contract numbers 48010 through 48017 originally bore contract numbers indicating the lots belonged to an Investex subsidiary. The original contract numbers were subsequently crossed out on the documents. The agreement *531 for deed with the contract number 48017, which was accepted by Investex on May 19, 1980, involves a lot which was not among the 67 petitioners claim were assigned to Rivertop. On or about September 4, 1980, Investex allowed the purchaser to exchange the lot for a more expensive lot which is among the 67 lots. The Investex monthly reports to the partnership for May, June, July, and August of 1980 reflect a sale for an amount corresponding to the contract price of the lot sold on May 19, 1980. Four agreements for deed, with contract numbers 48068 through 48071, each have notations in the upper left hand corner of the first page which state that the transactions are "house" sales. Under these contracts, each of which was accepted by Investex on December 18, 1980, the buyer, at the end of 6 months, could cancel the contract and obtain a full refund of all amounts paid, plus 15-percent interest. N.C. Land Investment, the buyer of a total of eight lots under two of the contracts, was a partnership in which Investex's chairman and chief executive officer, Martin Rothman, was a general partner. Rothman signed each of the two contracts as general partner on behalf of N.C. Land Investment. *532 Robert Tish, the stated buyer of a total of 13 lots under the other two contracts, is the son-in-law of Investex's vice president, Leonard Atlas. Atlas, without Tish's knowledge, signed his son-in-law's name to the two contracts. By September 1, 1981, Investex's records show each of these four contracts had been cancelled and that a full refund, including interest, was made. These four contracts are among the 27 discrepant transactions involving lots not among the 67 lots petitioners contend were assigned to Rivertop no later than June 30, 1980. In 1981, Investex entered into a bulk sale transaction with another real estate partnership it had organized called Oak River Associates. Rivertop partner Miller was a partner in Oak River Associates. Under Oak River's agreements with Investex, Oak River's lots were to be resold in 1981 and 1982. On November 29, 1982, eight of the lots, previously attributed to Rivertop in the December 18, 1980, "house" sales to N.C. Land Investment and Robert Tish, were sold under agreements for deed and contract numbers reflecting that the lots belonged to Oak River Associates. An Investex subsidiary, different from the one involved with Rivertop, *533 was the buyer of these eight lots now attributed to the Oak River partnership. 2. Mountain agreements for deed. Appendix D [13] *534 of this opinion, summarizes certain pertinent aspects of the Mountain retail lot sales contracts that petitioners contend were transacted in 1980. Of 124 retail sales transactions reported in the 1980 annual report furnished to Mountain, the parties have introduced contract documents in only 108 transactions into evidence. Like the Rivertop contracts and agreements for deed, an Investex subsidiary was to be employed as Mountain's representative to sell the lots. The only identification on the contracts regarding Mountain consists of a contract number which appears in the upper right hand corner of each document. The contract numbers were affixed to the contracts after they were executed by the purchaser and following acceptance by Investex. The 108 retail transactions detailed in Appendix D involve Riverbend lots. Of these 108 transactions, 27 are for the sale of 38 lots, none of which are among the 102 lots petitioners contend were assigned to Mountain on or before September 30, 1980. [14] The 27 contracts were accepted by Investex on various dates during the period August 21, 1980, to December 18, 1980. Most of the discrepant transactions involve contracts cancelled in 1980 and 1981. Two of them, numbered 68084 and 68089, involve contracts cancelled in March 1982. The agreement for deed with the contract number 68067, which was accepted by Investex on October 21, 1980, involves the sale of a lot not among the 102 lots which petitioners claim were assigned to Mountain. In December of 1980, the purchaser exchanged that lot for a more expensive lot which is among the 102 lots. However, the Investex monthly reports to Mountain for *535 October and November of 1980 reflect a sale for an amount equal to the contract price of the lot earlier sold on October 21, 1980. The two agreements for deed bearing contract numbers 68100 and 68101, have notations indicating that the transactions are "house" sales. Similar to Rivertop "house" sales, the contracts permit the buyers at the end of 6 months to obtain their money back with 15-percent interest. The buyer of 12 lots under these two contracts, is designated as Robert Tish, who is the son-in-law of Investex's vice president Leonard Atlas. Atlas, without Tish's knowledge, signed his son-in-law's name to both agreements. Investex's records show that both contracts were cancelled by August 1981 and that refunds of the amounts paid, plus interest, were made. The two contracts are among the 27 discrepant transactions involving sales of lots which were not listed among the 102 lots petitioners claim were assigned to Mountain no later than September 30, 1980. As mentioned above, in 1981 Investex entered into a bulk sale transaction with another real estate partnership it had organized called Oak River Associates. On November 29, 1982, 11 of the lots previously attributed to *536 Mountain in the December 18, 1980 "house" sales to Robert Tish, were sold under agreements for deed which indicated that the lots sold belonged to Oak River Associates. An Investex subsidiary was the buyer of the 11 lots now attributed to the Oak River partnership. Thirty-two of the 108 1980 Mountain agreements for deed were "Great" program sales. In a "Great" program sale, the contract provided that Investex would pay the down payment and the first six monthly payments on behalf of the buyer. In the event the buyer cancelled the contract, he would not receive a refund of the monies paid by Investex. Under the contract, Investex was free to substitute another lot of equal value at any time prior to the buyer's inspecting his lot. Journal Entries Made to Investex's Books and 1980 Highlights Letter Sent Each Partnership
Investex's books and records contained entries reflecting its bulk sales of lots to Rivertop and Mountain. Certain 1980 journal entries reflect that Investex sold 65 Riverbend lots to Rivertop and not the 43 Riverbend and 24 Oakwood Hills, Unit 7, lots, as contended by petitioners. Certain 1980 journal entries reflect that Investex sold 95 Riverbend lots to Mountain *537 and not 102 lots as contended by petitioners. At a point in time no later than mid-February 1981, the accounting firm of Schneider, Hirschhorn sent a letter entitled "Financial Highlights of 1980" to Rivertop partners. The letter advised that all of the partnership's land had been sold for a total price (including finance charges) of $ 988,601; that the partnership collected $ 62,805 from the land purchasers, of which $ 59,830 was used to pay sales commissions; and that over the next 7 to 10 years there would be projected collections of $ 925,796, from which the partnership, after expenses, would net approximately $ 300,000 to be distributed to the partners. At a point in time no later than mid-February of 1981, Schneider, Hirschhorn sent a letter entitled "Financial Highlights of 1980" to Mountain's partners. This letter advised that all of Mountain's land had been sold for a total price (including finance charges) of $ 1,445,807; that the partnership collected $ 105,882 from the land purchasers, of which $ 97,050 was used to pay sales commissions; and that over the next 7 to 10 years there would be projected collections of $ 1,339,925, from which the partnership, after expenses, *538 would net approximately $ 430,000 to be distributed to the partners. Cash Distributions Made to the Partnerships and Investex's Subsequent Financial Difficulties
Investex distributed, on or about the dates indicated, payments to Rivertop, as follows: Date
Amount
October 29, 1980
$    476.85
January 23, 1981
2,698.06
April 16, 1981
5,545.39
July 24, 1981
3,087.72
October 30, 1981
4,537.74
January 29, 1982
3,890.42
May 12, 1982
4,454.94
December 16, 1982
13,970.68
February 24, 1983
5,076.85 Investex distributed, on or about the dates indicated, payments to Mountain, as follows: Date
Amount
October 29, 1980
$    731.50
January 23, 1981
7,533.79
April 27, 1981
6,911.00
July 24, 1981
7,744.03
October 30, 1981
6,364.82
January 29, 1982
8,694.35
May 12, 1982
8,650.44
December 16, 1982
18,877.98
February 24, 1983
9,009.83
In 1982, Investex began to experience financial difficulties. No further cash distributions were made to Rivertop and Mountain after February 1983. Subsequently, as a result of a June 8, 1984, settlement between Investex, Rivertop, Mountain, and five other Investex-organized partnerships, Investex conveyed 393 lots in Walton County, Florida, to the seven partnerships. Partnership's 1980, 1981 and 1982 Tax Returns *539 and 1980 Partnership Losses Claimed by Petitioners
Irwin Hirshchorn of Schneider, Hirschhorn prepared the 1980, 1981, and 1982 partnership tax returns of Mountain. He also prepared Rivertop's 1980, 1981, and 1982 partnership tax returns. Mountain on its 1980 tax return reported the following income and deductions: Income
Gross receipts or sales
$   254,212 Cost of goods sold
(160,000)
Gross profit
$    94,212
Deductions
Selling expenses
$   138,000 Commission expenses
1,002,173 Bank charges
27 Total Deductions
1,140,200
Ordinary Loss
$ 1,045,988 Mountain elected on its return to report sales on the installment method. [15] *540 Mountain's 1981 and 1982 partnership returns reported the following income and deductions: 1981
1982
Gross receipts & profit
$ 171,448
$ 195,846
Professional fees
1,020
6,238
Bank charges
10
20
Total Deductions
1,030
6,258
Ordinary Income
$ 170,418
$ 189,588 Rivertop's 1980 partnership tax return reported the following income and deductions: Income
Gross receipts or sales
$ 156,496
Cost of goods sold
100,000
Gross profit
$  56,496
Deductions
Selling expenses
$  90,000
Commission expenses
683,077
Bank charges
29
Total Deductions
$ 773,106
Ordinary Loss $ 716,610 The partnership elected to report its sales on the installment method. [16] *541 Rivertop on its 1981 and 1982 returns reported the following income and deductions: 1981
1982
Gross receipts & profit
$ 136,105
$ 81,702
Commissions
$   -- $  4,213
Professional fees
975
3,519
Bank charges
12
14
Total Deductions
$     987
$  7,746
Ordinary Income
$ 135,118
$ 73,956 The Gulas, the Ferayornis, the Roger C. Zahns, the Koshes, the Robert C. Zahns, and the Ostrows, on their respective 1980 joint individual income tax returns, claimed the following deductions as their distributive shares of Mountain's 1980 loss: Taxpayers
Partnership Loss Claimed
Gulas
$ 52,613
Ferayornis
59,786
Roger C. Zahns
70,186
Koshes
59,726
Robert C. Zahns
70,186
Ostrows
52,613
The Werksmans, the Millers, the Johnsons, and the Patels, on their respective 1980 joint individual income tax returns claimed the following deductions as their distributive shares of Rivertop's 1980 loss: Taxpayers
Partnership Loss Claimed
Werksmans
$ 132,008
Millers
56,574
Johnsons
113,149
Patels
75,433
Additional *542 Professional Income Erroneously Attributed to Gula and Ferayorni
During 1980, two health insurance companies paid a total of $ 15,912 for services that had been rendered and billed by Gula's professional corporation, the Greater Fort Lauderdale Bone & Joint Surgery, P.A. The two insurance companies incorrectly reported to the Internal Revenue Service that the payments had been made to Gula. The payments were income of the professional corporation, not income of Gula. The corporation reported the payments on its income tax return. During 1980, a county hospital agency and a health insurance company paid a total of $ 5,349 for services that had been rendered and billed by Ferayorni's professional corporation, Julian Ferayorni, M.D., P.A. These two payors incorrectly reported to the Internal Revenue Service that the payments had been made to Ferayorni. The payments were income of the professional corporation. The corporation reported the payments on its income tax return. Notices of Deficiency, Petitions, Petitioners' Responses to Respondent's Discovery Requests, and the Court's January 12, 1987, Order
A. Notices of Deficiency. Respondent examined the 1980 partnership returns of *543 Rivertop and Mountain. Each partnership was represented by members of the Schneider, Hirschhorn accounting firm. During February and March of 1984, respondent issued separate notices of deficiency for 1980 to the Gulas, Ferayornis, Roger C. Zahns, Koshes, Robert C. Zahns, and Ostrows disallowing the deductions claimed with respect to Mountain. In the Gulas' notice of deficiency respondent also determined there were various unreported items of nonpartnership income. The unreported items consisted of $ 2,710 of nonemployment compensation from two companies, American Mutual Liability and Chubb and Son, Inc., $ 260 of dividend income from LTV Corporation and $ 15,912 of medical payments from the Traveler's Insurance Company and Blue Cross/Blue Shield. The $ 260 of unreported dividend income was based on the information contained in a Form 1099 received by Internal Revenue Service from the payor, LTV Corporation. Respondent further determined that the Gulas' underpayment of tax was attributable to negligence or intentional disregard of the rules and regulations and that they were liable for an addition to tax under section 6653(a). In the Ferayornis' notice of deficiency, respondent *544 also determined that there were various unreported items of nonpartnership income. The unreported items consisted of $ 46 in interest income from three payors ($ 10 from First Federal of Broward, $ 20 from Southern Federal Savings, and $ 16 from Shephard), $ 1,703 in dividend income ($ 10 from Paine Webber, $ 930 from Oppenheimer Co., Inc., and $ 763 from Oppenheimer Money Market), $ 5,058 of nonemployment compensation, and $ 291 of medical income. Respondent further determined that the Ferayornis' underpayment of tax was attributable to negligence or intentional disregard of the rules and regulations and that they were liable for an addition to tax under section 6653(a). During March and May of 1984, respondent issued separate 1980 notices of deficiency to the Werksmans, Millers, Johnsons, and Patels disallowing the deductions each had claimed regarding Rivertop. B. Petitions. Following the issuance of the notices of deficiency, all of the petitioners and the decedent Kosh were represented by the law firm of Bernstein, Bernstein & Bernstein, their former counsel in these consolidated cases. The Bernstein firm had been well-acquainted with Investex's operations and its bulk sales *545 transactions with various real estate partnerships it had organized. [17] *546 Each of the petitions in these consolidated cases was prepared by attorneys in the Bernstein firm. The petitions of the Gulas, Ferayornis, Roger C. Zahns, Koshes, Robert C. Zahns, and Ostrows each contain the following allegations: 5. The facts upon which Petitioners rely as the basis for their case are as follows: A. Petitioner * * * in calendar year 1980 invested in and became a member of a general Florida Partnership, Mountain * * *. The Partnership, during *547 calendar year 1980, purchased from [the Investex subsidiary] Ecological Development, Inc., * * * (hereinafter referred to as "EDI") the beneficial ownership of 125 lots, consisting of approximately 110 acres of undeveloped land located in [the Riverbend tract] * * *. * * * The Partnership, in calendar year 1980, as a result of EDI's sales efforts, reported sales in the amount of $ 1,445,807.00, which consisted of substantially all of the Partnership's lot[s]. The majority of the sales made by the Partnership in calendar year 1980 was on the installment basis. The Partnership suffered a loss from operations in calendar year 1980, of which the Petitioners' distributive share was * * *. Petitioners properly reported said loss on their calendar year 1980 tax return. * * * The petitions of the Werksmans, Millers, Johnsons, and Patels each contain the following allegations: 5. The facts upon which Petitioners rely as the basis for their case are as follows: A. Petitioner * * * in calendar year 1980 invested in and became a member of a general Florida Partnership, Rivertop * * *. The Partnership, during calendar year 1980, purchased from [the Investex subsidiary] Ecological Development, *548 Inc., * * * (hereinafter referred to as "EDI") the beneficial ownership of the following properties: 98 lots, consisting of approximately 81 acres of undeveloped land located in [the Riverbend tract], approximately 81 lots consisting of approximately 29 acres of undeveloped land located in Unit 7 of Oakwood Hills in Walton CountyFlorida and approximately 33 lots consisting of approximately 24 acres of undeveloped land in [the Three Top Mountain tract] * * *. * * * The Partnership, in calendar year 1980, as a result of EDI's sales efforts, reported sales in the amount of $ 998,601.00, which consisted of substantially all of the Partnership's lot[s]. The majority of the sales made by the Partnership in calendar year 1980 was on the installment basis. The Partnership suffered a loss from operations in calendar year 1980, of which the Petitioners' distributive share was * * *. Petitioners properly reported said loss on their calendar year 1980 tax return. * * * C. Respondent's Discovery Requests and this Court's Order of January 12, 1987. On January 12, 1987, this Court held a hearing on respondent's motion to compel production of certain documents requested from petitioners. Petitioners *549 were represented by an attorney from the Bernstein firm. Petitioners' attorney, in reply to questions by the Court, stated and we have found that the schedules describing the specific lots acquired by each partnership referred to in the Mountain and Rivertop partnership agreements, lot sales agreements, and nonexclusive representative agreements had not been attached when the agreement documents were executed. He further stated, and we have found, that although the schedules of the Mountain and Rivertop lots had been furnished to respondent, petitioners were unaware of the dates when the lots were assigned by Investex to the partnerships. [18] *551 *552 The list of the 102 Riverbend tract lots which petitioners provided and contended were owned by Mountain is contained in Appendix B, infra. The list of the 43 Riverbend tract lots and the 24 Oakwood Hills, Unit 7 tract lots petitioners provided and contended were owned by Rivertop, is contained in Appendix A, infra. With respect to the agreements for deed in the retail sales transactions which petitioners claimed were made by the partnerships, petitioners' attorney stated, and we have found, that on or about the time of trial, the partnerships *550 did not have these documents and that the contracts furnished to respondent had been obtained from Investex. He also stated, and we have found, that although the partnerships had initially received the contracts in retail transactions, they later dispensed with receiving them and merely received monthly reports on the transactions from Investex. The retail contracts initially received from Investex were not retained by the partnerships. [19] *553 *554 Petitioners' attorney contended that respondent's counsel might already have some of the documents sought in discovery as a result of an examination respondent made of Investex's returns. Following the January 12, 1987, hearing, this Court entered an order prohibiting petitioners from offering any evidence that would contradict their responses concerning the requested documents. OPINION The issues in controversy are: (1) Whether the partners' claimed 1980 deductions concerning the Rivertop and Mountain partnerships are allowable; (2) whether the Gulas and the Ferayornis each failed to report certain items of nonpartnership income; and (3) whether the Gulas *555 and/or the Ferayornis are liable for an addition to tax under section 6653(a). Petitioners bear the burden of proof and must establish that respondent's determinations are erroneous. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). I. Petitioners' 1980 Partnership Loss Deductions
Each petitioner-husband and the decedent Kosh was a partner in either Rivertop or Mountain. Petitioners are entitled to their respective 1980 partnership loss deductions only if the deductions reported by their partnership are in fact allowable to that partnership. Under subchapter K of the Internal Revenue Code, a partnership is a tax-reporting entity. While the partnership's income or loss flows through to its partners, its actual income or loss and profit objective must first be determined at the partnership level. United States v. Basye, 410 U.S. 441 (1973); Brannen v. Commissioner,722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Finoli v. Commissioner,86 T.C. 697, 721-722 (1986). Respondent contends that none of the expenses deducted by the partners for 1980 are allowable as business deductions. He asserts that, notwithstanding each partnership's agreement with Investex *556 for the purchase and resale of lots, neither Rivertop nor Mountain became the beneficial owner of any real property in 1980. Respondent alternatively contends that neither partnership was entitled to business deductions because the claimed expenses were not attributable to an activity engaged in for profit. Petitioners, on the other hand, maintain that each partnership pursuant to its transaction with Investex, became the beneficial owner of 67 lots for Rivertop or 102 lots for Mountain in 1980. They assert that each partnership's claimed expenses were business expenses incurred in an activity carried on for profit. Petitioners contend that they are therefore entitled to the claimed partnership loss deductions. The disputed 1980 deductions involve selling expenses, commissions, and bank charges. [20] *557 The claimed selling expenses were in the form of cash advances paid by the partnerships to Investex subsidiaries which were employed to be the partnerships' sales representatives. The commission expenses were for amounts claimed to have accrued and to have been owed the sales representative for its part in reselling the lots each partnership had ostensibly purchased from Investex. Each partnership utilized an accrual method of accounting. Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable certainty. Sec. 1.461-1(a)(2), Income Tax Regs.
We agree with respondent that neither Rivertop nor Mountain was entitled to deduct the commissions. In 1980, neither partnership was the beneficial owner of any lots. We further conclude that none of the remaining disputed expenses qualify as business deductions because neither partnership was engaged in an activity carried on for profit. Accordingly, we need not reach the other grounds for disallowance raised by respondent. The record in this case does not reflect if either partnership ever assumed the benefits and burdens of real property ownership under the original agreements with *558 Investex and its subsidiaries. The record does reflect that, as a result of a June 8, 1984, settlement, Investex conveyed 393 lots in Walton County, Florida, to Rivertop, Mountain, and five other Investex-organized partnerships. Petitioners' failure to show that Rivertop and Mountain acquired the benefits and burdens of ownership over specific lots at any time earlier than June 1984 is a major element in our finding a lack of economic substance regarding each partnership's transaction with Investex and its subsidiaries. A. Beneficial Ownership of Lots and 1980 Deductions for Commissions.
Each partnership reported relatively large amounts of accrued expenses for commissions to be owed an Investex subsidiary for reselling lots which were to be beneficially owned by the partnerships. As part of its bulk sale arrangement with Investex, each partnership was to have previously acquired beneficial ownership of the lots resold by the Investex subsidiary. Under this arrangement with Investex, each partnership was to be beneficial owner of lots without holding record title to its lots. Petitioners and respondent recognize that in order for the partnerships to be entitled to any deductions for *559 commissions, each partnership must have been the owner for tax purposes. Indeed, each partnership's agreement with Investex called for it to be the beneficial and tax owner of the lots. In the agreements, each partnership was stated to be "the beneficial owner" of the lots to be resold. If beneficial ownership was not conveyed by Investex, then Rivertop and Mountain would not be liable to Investex for commissions on the resale of lots which Investex continued to beneficially own. In other words, the all-the-events test of section 1.461-1(a)(2), Income Tax Regs., would not be satisfied and no deductions could properly be accrued for "commissions." For a sale to have occurred for tax purposes, the benefits and burdens of ownership must be transferred. Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237-1238 (1981). This test is a practical one and there are no hard and fast rules. Instead, the transaction must be viewed as a whole, in light of realism and practicality. Commissioner v. Segall,114 F.2d 706, 709-710 (1940), revg. on other grounds 38 B.T.A. 43 (1938); Harmston v. Commissioner,61 T.C. 216, 228-229 (1973), affd. 528 F.2d 55 (9th Cir. 1976). Some of the *560 factors to be considered are: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity in the property was acquired; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238. See also Cherin v. Commissioner,89 T.C. 986, 996-997 (1987). The parties sharply disagree over whether either partnership became the beneficial owner of any lots in 1980. The parties have stipulated that no schedules of the specific lots to be acquired existed when each partnership entered into its respective agreements with Investex. Investex was to select and assign the individual lots to be owned by Rivertop and Mountain. Petitioners contend that the 43 Riverbend lots and the 24 Oakwood Hills, Unit 7 lots listed in Appendix A were assigned to Rivertop *561 no later than June 30, 1980. They also contend that the 102 Riverbend lots listed in Appendix B were assigned to Mountain no later than September 30, 1980. The lots listed in Appendices A and B, infra, are the only lots which petitioners have claimed were owned by the partnerships in 1980. Respondent's position is that no finalized schedules of the partnerships' lots were created by Investex until long after 1980 and that the partnerships failed to assume the benefits and burdens of ownership over any specific real property. 1. The disputed schedules of lots. In resolving whether each partnership beneficially owned its contended 67 or 102 lots, a key factual dispute is whether during 1980 Investex prepared and furnished to each partnership a list of those lots set forth in Schedules A or B. We have found that these schedules of lots were created after 1980. Petitioners offered the testimony of a number of Investex's officers and also that of the members of the Schneider, Hirschhorn accounting firm. To support their contention that Rivertop and Mountain had received the stated lots no later than June 30, 1980, and September 30, 1980, respectively, petitioners rely heavily on *562 the testimony of Investex's chief financial officer, Michael Kramer, and Irwin Hirschhorn, the accountant for each partnership. Both testified that the lots listed in Appendices A and B, infra, were the lots Investex had assigned, during 1980, to Rivertop and Mountain. Kramer testified that a schedule of these lots would have been prepared and furnished to each partnership no later than 3 weeks after the date of its agreements with Investex. Hirschorn testified he received the schedules within about a week after the agreements were executed. After weighing the testimony offered, we are unable to believe Kramer's and Hirschhorn's testimony concerning when these lots and the schedules listing them were received by Rivertop and Mountain. Their testimony is not supported by Investex's records. Investex's journal entries, concerning the transaction with Rivertop, reflect that during 1980, 65 Riverbend lots were "sold" to the partnership, not the 43 Riverbend lots and 24 Oakwood Hills, Unit 7 lots which were listed on the Schedule A. Similarly, the journal entries on the Mountain transaction reflect that in 1980, 95 Riverbend lots were "sold" to the partnership, not the 102 Riverbend *563 lots contained in Schedule B. Incidentally, the workpaper concerning the journal entries to be made on the Mountain transaction is designated "JE # 9-2-80." More importantly, Kramer's and Hirschhorn's statements are further discredited when we consider the substantial discrepancies between these lots sold (which sales Investex attributed to the partnerships and upon which commissions were claimed) and the lots listed in the schedules. If the partnerships were assigned the 67 and 102 lots on the dates testified to, Investex would not have credited each partnership with so many sales involving "non-assigned" lots during 1980. Twenty-seven out of the 63 Rivertop agreements for deed in the record are for the sale of lots not listed among the 67 lots in Rivertop's schedule. These 27 discrepant transactions involve the sale of a total of 44 lots, none of which are among the 67 lots petitioners contend were assigned "no later than June 30, 1980." The contracts in these 27 discrepant transactions were accepted by Investex at various dates over the period from May 23, 1980 through December 18, 1980. Four of the discrepant transactions (contracts which Investex "accepted" on December 18, *564 1980), were "house" sales involving Investex's chairman and vice president. The 21 lots "sold" for the partnership, pursuant to these "house" sales, are not listed among the 67 lots in Rivertop's schedule. Twenty-seven out of the 108 Mountain agreements for deed are for the sale of lots not listed among the 102 lots in Mountain's schedule. These 27 discrepant transactions involve a total of 38 lots, none of which are included among the 102 lots petitioners contend were assigned to Mountain "no later than September 30, 1980." The contracts in these 27 transactions were "accepted" by Investex on various dates from August 21, 1980, to December 18, 1980. Two of the discrepant transactions, where the contracts were accepted by Investex on December 18, 1980, were "house" sales involving Investex's vice president Leonard Atlas. None of the 12 lots "sold" to Atlas' son-in-law in the two "house" sales are among the 102 lots in Mountain's schedule. [21] *565 On brief, petitioners attempt to minimize the significance of these discrepant transactions by suggesting they may have been caused by either clerical errors or a replatting of the lots in the Riverbend development. These explanations are unfounded and are specifically refuted by the evidence in the record. Investex had engaged in the retail land sale business since 1971. Its chief financial officer, Michael Kramer, testified that Investex's books and records were properly maintained and were in excellent shape when he joined the company late in 1979. Kramer and other Investex employees elaborated in detail about the company's record keeping and inventory control practices used in retail lot transactions. They testified that an inventory control card is maintained for each lot in Investex's developments. This card, they explained, *566 would reflect whether a lot had been sold under an outstanding agreement for deed or whether it was currently available for sale. The card would also show whether the lot was owned by Investex or assigned to a particular bulk purchaser. Thus, according to the witnesses, prior to accepting a retail contract on a lot, the Investex office personnel processing the contracts could examine the lot's inventory control card. When a retail sale was made, appropriate entries should have been made on the lot card and on Investex's other records. Petitioners' argument that the discrepancies may have been due to the replatting of the Riverbend development's lots that began during the fall of 1980 is also without substance. Petitioners, in raising the replatting argument, contend that "whether the replatting had any significance with respect to the lot numbers appearing on the [lot schedules] versus those appearing on the contracts is not established in this record." The evidence in the record indicates that the replatting did not alter or change the section and lot number designations of the Riverbend lots. After examining the legal descriptions in certain deeds, it appears that the sole effect *567 of the replatting was to change the book and page number under which the lot could be found in the county recorder's records. The section and lot numbers by which the lot was identified remained unchanged. Not only are Kramer's and Hirschhorn's claims contradicted by Investex's contemporaneous records, their testimony is self-serving. By 1980, Investex, Kramer's company, was primarily engaged in the business of promoting and selling tax shelters. Its retail land sale business had become only an adjunct to its immensely more lucrative tax shelter business. Most of the cash generated in the company's operations was from bulk sale (tax shelter) transactions. Hirschhorn and the other Schneider, Hirshchorn accounting firm members worked closely with Investex to sell these tax shelters. During 1980 through 1982, most of the investing partners were either clients of Schneider, Hirshchorn or another Miami-area accountant. In these consolidated cases, all petitioners, other than the Roger C. Zahns and the Robert C. Zahns, were accounting clients of Schneider, Hirshchorn. The firm sent letters to its accounting clients soliciting their investment in Rivertop and Mountain and emphasizing *568 the potential tax benefits to be derived. These letters state that Schneider, Hirschhorn had been engaged in this promotional activity for the past 5 years. [22] Hirschhorn, at trial, admitted that Investex paid Schneider, Hirschhorn substantial "consulting fees" although his firm did no accounting work for them. He also acknowledged the ethical conflict for his firm, on the one hand, to recommend the Investex partnership offering to clients and on the other hand to earn substantial fees from Investex for "consulting" work. [23] *569 The record in this case *570 supports the finding that the lot schedules were created after the fact and subsequent to the time those retail transactions had been cancelled. After examining the tax benefits promised and the conditions under which Investex's retail land sale operation was conducted, it becomes apparent why Investex failed to assign specific lots in 1980 to the partnerships. Investex's agreements with Rivertop and Mountain called for it to resell all of the partnerships' lots before the end of 1980. Additionally, the tax benefits promised the individual partners would not materialize if a retail transaction was cancelled within the first or following year. As recognized in the tax opinions, unpaid commissions would have to be reported as income due to cancellation of indebtedness even though the partnerships would not be liable to pay unpaid commissions following cancellation of a sale. Considering the manner in which retail land sales were transacted, it would be most difficult, if not impossible, for Investex to assign a large number of specific lots to each partnership, resell all the lots in the remaining part of 1980, and also avoid cancellation of a substantial percentage of the retail *571 sales within the next year. As the Investex officers acknowledged, many retail buyers elected to cancel their contracts and obtain refunds. Such cancellations were an expected part of the retail land sales. The retail agreements, in accordance with Florida law, allow the buyers right to cancel. In order to market lots, Investex would frequently extend a buyer's cancellation period, in some cases to as long as 6 months. The buyer's subsequent exercise of the exchange privilege was beyond Investex's control. Upon exercising this privilege, the buyer could exchange the contracted lot for another lot in the development. Finally, in all retail transactions, possibly other than in "Great" program sales, the buyer, not Investex, would choose the lot. Investex has little control over whether a retail customer would decide to select one of the lots assigned to a particular bulk purchaser. Yet, Investex's officers testified that no quotas had been established to require salesmen to push specific lots owned by a particular partnership. According to these witnesses, the salesmen generally did not know whose lots were being sold. According to Leonard Atlas, Investex's vice president in *572 charge of sales and marketing, Investex made a conscious effort to treat all owners of lots in bulk -- whether itself or a specific bulk sale purchaser -- on an equal basis. The only logical explanation is that the schedules petitioners have offered were created after 1980. In addition to the evidence discussed above, we note the great number of inconsistencies, lapses, and contradictions in petitioners' position and in the testimony of their witnesses. Although some inconsistencies have already been discussed, others exist, including those in the testimony of Stanley Frankowitz, Rivertop's managing partner. Contrary to the parties' stipulation, the representations made by petitioners' attorney and this Court's order of January 12, 1987, Frankowitz testified that a schedule of the 67 lots had been attached when he executed Rivertop's agreements with Investex on April 16, 1980. [24] *574 *575 *576 Similarly, Robert Birenbaum, Investex's senior vice president, testified about the Rivertop offering materials and the reference to the Three Top Mountain lots. The offering materials proposed that Rivertop would acquire lots in Three Top Mountain, whereas the partnership's schedule of lots contained no *573 reference to Three Top Mountain lots which were not actually acquired. Birenbaum stated that at the time the partnership offering memorandum was circulated, it had not been contemplated that Rivertop would acquire lots in the Three Top Mountain tract. Birenbaum, however, offered no explanation as to why Rivertop's April 16, 1980, lot sales agreement specifically allocates a $ 12,500 portion of the overall price paid by the partnership for its lots to Three Top Mountain lots. He also failed to explain why the allocation to Three Top Mountain, if erroneous, had been initialed by Martin Rothman, Investex's chief executive officer, Leonard Atlas, vice president in charge of sales and marketing, and Stanley Frankowitz, Rivertop's managing partner. Lastly, Birenbaum did not address how this inconsistency had escaped the attention of the law firm that prepared the Rivertop offering memorandum and had performed the company's securities work. [25] 2. Benefits and burdens of ownership. Petitioners have failed to establish that each partnership received a schedule of purchased lots from Investex during 1980. Petitioners represented *577 that the lots listed in Appendices A and B were the only lots beneficially owned by each partnership under its agreements with Investex. The respective schedules, however, were found to have been prepared and furnished to each partnership after 1980. Moreover, the Werksmans, the Millers, the Johnsons, and the Patels -- in responses to requested admissions served by respondent -- admitted Rivertop neither acquired nor sold any lots in the Oakwood Hills, Unit 7 tract. Additionally, the schedules, actually provided to the partnerships, contain reference to lots which do not correspond to Investex's records. After considering each partnership's transaction as a whole, we conclude that neither Rivertop nor Mountain became the beneficial owner of any real property in 1980. Commissioner v. Segall, 114 F.2d 706, (1940), revg. on other grounds 38 B.T.A. 43 (1938); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221 (1981); Harmston v. Commissioner, 61 T.C. 216 (1973), affd. 528 F.2d 55 (9th Cir. 1976). The partnerships did not obtain record title to any lots. Under arrangements with Investex, record title was retained by Investex. Investex's officers testified that while each partnership *578 (under the nonexclusive representative agreement) could attempt to sell the assigned lots, such activity was neither contemplated nor economically feasible. To sell a specific lot, a partnership would have to first obtain record title from Investex and register the lots with the Florida state Division of Land Sales and with other government agencies. The partnership would then incur large expenses in retailing the lots. In any event, the representative agreement would still obligate the partnership to pay commissions on any lots Investex sold for it prior to December 31, 1980. The record also shows that neither partnership paid any real property taxes. [26] Beneficial ownership of specific lots of real property was not transferred *579 by Investex to either partnership during 1980. While the lots under agreements for deed may eventually have been attributed to Rivertop and Mountain, neither partnership, in 1980, actually acquired the benefits and burdens of ownership. Investex, instead, was awaiting to see whether the retail purchasers in these and perhaps other retail transactions would cancel their contracts. This is shown by the fact that a number of lots purportedly sold for each partnership, including those under certain "house" sale arrangements involving Investex's officers, do not appear among the lots listed in Appendices A and B. Twenty-seven Rivertop and 27 Mountain agreements for deed were cancelled in 1980, 1981, and 1982. The 27 Rivertop and 27 Mountain transactions did not involve lots among the 67 and 102 lots, respectively, listed in the schedules Investex provided to each partnership sometime after 1980. A total of 44 lots, purportedly sold for Rivertop under the 1980 agreements for deed of record, do not appear among the lots listed in Appendix A. Similarly, a total of 38 lots, purportedly sold for Mountain under the 1980 agreements for deed of record, do not appear among the lots listed *580 in Appendix B. Yet, Rivertop and Mountain claimed deductions for these lots "sold." Petitioners have not explained to us how each partnership could be entitled to deduct commissions on Investex's sale of these lots, when such lots are not among those which petitioners contend the partnerships owned. Generally, the risk that a retail contract for lots will subsequently be cancelled is a risk borne by the property's true owner. In 1980, that was Investex's risk and not the risk of Rivertop or Mountain. A number of the lots purportedly sold for each partnership in the "house" sales were again sold in 1982 by Investex in transactions which were attributed to yet a third partnership. The partnerships did not achieve beneficial ownership of the lots in the agreements for deed which do appear in Appendices A and B. To the extent any retail sales were made, the sales were those of Investex, not those of either Rivertop or Mountain. B. Section 183. Rivertop and Mountain for 1980 each claimed certain business deductions for selling expenses and bank charges. The claimed selling expenses were for cash advanced to the Investex subsidiary employed to resell and develop each partnership's *581 lots. [27]
In order to be entitled to deduct these expenses, the partnerships must have been engaged in a trade or business or the production of income within the meaning of sections 162 or 212, respectively. The partnership agreements contained the statement that it would engage in the business of owning, developing, and selling the lots it had acquired from Investex. Whether each partnership engaged in an activity for profit depends on whether the activity was undertaken with an actual and honest objective of making a profit. Fuchs v. Commissioner, 83 T.C. 79, 98 (1984); Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The expectation of profit need not have been a reasonable one, but the activity must have been entered into, or continued, with the objective of making a profit. Golanty v. Commissioner, 72 T.C. 411, 425-426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). The issue of profit objective must be resolved at *582 the partnership level. Brannen v. Commissioner, 722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Finoli v. Commissioner, 86 T.C. 697, 721-722 (1986). An "activity not engaged in for profit" is defined in section 183(c) as any activity other than one for which deductions are allowable under section 162 or section 212(1) or (2). While section 183 is actually an allowance provision, not a disallowance provision, the regulations thereunder have historically been used to assist in the determination of the requisite profit objective. Section 1.183-2(b), Income Tax Regs., sets forth nine relevant factors. No one factor is determinative in making this determination. Further, the regulations acknowledge the nine factors listed are not the only factors which may be taken into account. The resolution of whether a profit objective exists is to be made on the basis of all the facts and circumstances. Elliott v. Commissioner, 84 T.C. 227, 236 (1985), affd. without opinion 782 F.2d 1027 (3d Cir 1986); Golanty v. Commissioner, supra at 426. More weight is to be to given objective facts than to mere self-serving statements of intent. Beck v. Commissioner, 85 T.C. 557, 570 (1985); *583 Siegel v. Commissioner, 78 T.C. 659, 699 (1982). As we have previously found, neither partnership was the beneficial owner of any real property in 1980. It was not until June 1984 that Investex actually conveyed 393 Florida lots to Rivertop, Mountain, and five other real estate partnerships. The partnerships' activities were not carried on in a businesslike manner. Through the time of the trial, the partners of Rivertop and Mountain were unaware of the identity of the specific lots which should have been owned in 1980 by their respective partnerships. Their confusion and disarray is illustrated by the allegations made in their petitions concerning the lots each partnership acquired and the representations made by petitioners' attorney regarding the specific lots assigned by Investex to each partnership. Indeed, the very schedules petitioners produced to respondent during pretrial discovery were created and furnished to each partnership after 1980. In the case of the Rivertop partnership, petitioners have subsequently admitted the 24 Oakwood Hills, Unit 7 lots listed in Schedule A were never acquired. The Rivertop partners' ignorance concerning the lots their partnership "owned" *584 is further manifested by the testimony Rivertop's managing partner gave at trial. He testified that a schedule of the 67 lots had been attached when he executed the partnership's April 16, 1980, agreements with Investex. This factual assertion is directly contrary to the parties' stipulation and the representations made to this Court by petitioners' attorney. Neither partnership maintained adequate records. Petitioners, according to their attorney, were not even able to determine the specific dates on which Investex had furnished Rivertop and Mountain lists of the partnerships' assigned lots. Also, while each partnership's representative agreement provided that it was to be furnished copies of all retail contracts made for the sale of its lots, this requirement was waived. Each partnership subsequently obtained some of its retail contracts from Investex only in preparation for trial. The early contracts which had been received were not retained, although the receivables evidenced by such contracts would presumably have been valuable partnership assets. The record shows that the partners of Rivertop and Mountain expended little time and effort in carrying out their partnership's *585 stated activity. Each partnership agreement provided that the management of the partnership's affairs would be delegated to a single managing partner. Further, the partnership agreement recognized that the managing partner would not devote much time to the management of the partnership's affairs, as each partnership would enter into a representative agreement to have an Investex subsidiary resell, develop, and otherwise manage the partnership's property. At trial, Rivertop's managing partner, Stanley Frankowitz, testified he did nothing beyond what Irwin Hirschhorn, the partnership's accountant, instructed him to do. While Frankowitz testified Hirschhorn had specifically advised him that as managing partner he was to be responsible for maintaining Rivertop's records, inadequate records were maintained. Bryan Sayer, Mountain's managing partner, testified he did very little. Frankowitz was a practicing osteopath; Sayer was a physician occupied with his own medical practice. Once petitioners had claimed their tax benefits for 1980, their interest in the partnership activity, to the extent any ever existed, waned or disappeared. Nevertheless, at trial a number of petitioners testified *586 they became partners in Rivertop and Mountain in the hopes of making a profit from their investment. While all acknowledged being aware of the large potential tax benefits, each claimed his motivation had been the prospect of deriving, aside from tax considerations, an economic profit. We consider such testimony to be self-serving. We believe each petitioner was motivated by the anticipated tax benefits. The projections contained in the letters, which Schneider, Hirschhorn sent to the petitioners, show that each petitioner would realize only about a 15-percent return on his investment after 10 years. Regardless of each petitioner's intentions, it is the profit objective of the partnership, not that of the individual partner, which must be determined. Brannen v. Commissioner, supra; Finoli v. Commissioner, supra.Moreover, petitioner's testimony is substantially diminished by the objective evidence in the record which shows that the partnerships did not possess an actual and honest profit objective. Beck v. Commissioner, supra; Golanty v. Commissioner, supra.
Based on the entire record, we conclude that Rivertop and Mountain did not have the requisite profit objective. Each *587 partnership did not acquire the lots they were supposed to have received under its agreements with Investex. The activity was not carried on in a businesslike fashion. The record reflects that the partners paid scant attention to their partnership's affairs. Neither Rivertop nor Mountain was engaged in a trade or business within the meaning of section 162, nor was either partnership engaged in an activity described under section 212(1) or (2). Accordingly, the partnerships were not entitled to claim any commissions expense and we sustain respondent's disallowance of the partnership losses claimed by petitioners. Because of this holding, it is unnecessary to decide whether section 465 applies to limit each petitioners' deductions for 1980. II. Unreported Income of the Gulas and the Ferayornis Respondent determined that the Gulas and the Ferayornis had certain unreported items of nonpartnership income. In our findings, we have determined that the $ 15,912 of medical payments from two health insurance companies attributed to Mr. Gula in the notice of deficiency, was the income of his professional corporation. Likewise, we have redetermined that $ 5,058 of "nonemployment" compensation *588 and $ 291 of medical payments attributed to Mr. Ferayorni in the notice of deficiency was the income of Mr. Ferayorni's professional corporation. As to the balance of the unreported items of nonpartnership income, petitioners offered no evidence at trial. Petitioners bear the burden of proof. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). We thus hold that the Gulas had $ 2,710 of unreported nonemployment compensation and $ 260 of unreported dividend income for 1980. We further hold that the Ferayornis had $ 46 of unreported interest income and $ 1,703 of unreported dividend income for 1980. III. Section 6653(a) Additions to Tax
Respondent determined that the Gulas and the Ferayornis were each liable for an addition to tax under section 6653(a) because their 1980 underpayment of tax was attributable to negligence or intentional disregard of rules and regulations. We have held that neither the Gulas nor the Ferayornis are entitled to the partnership loss deduction claimed for 1980 in regard to Mountain. We have also found the Gulas to have a total of $ 2,970 of unreported income. We have found the Ferayornis to have a total of $ 1,749 of unreported income. Petitioners *589 bear the burden of showing they are not liable for such additions to tax. Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972); Rule 142(a). The amounts of redetermined unreported income are not insignificant and petitioners have offered no explanation for these omissions. These unexplained income omissions justify, especially when coupled with petitioners' claims of substantial losses in connection with the partnership, the imposition of the section 6653(a) additions to tax. Davis v. Commissioner, 81 T.C. 806, 820 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985). Accordingly, we sustain respondent's determination that the Gulas and the Ferayornis are liable for an addition to tax under section 6653(a) for 1980. Decisions will be entered for the respondent in docket Nos. 16846-84, 18945-84, 20114-84, 20208-84, 21389-84, 21391-84, 21392-84 and 26815-84. Decisions will be entered under Rule 155 in docket Nos. 15405-84 and 15924-84 . APPENDIX A
RIVERTOP
1 1 41 1 1 62 1 1 85 1 1 99 1 1 109 1 1 113 1 1 114 1 1 138 1 1 140 1 2 239 1 2 275 1 2 282 1 2 284 1 2 286 1 2 312 1 2 361 1 2 374 2 0 147 2 0 184 2 0 207 2 0 351 3 0 27 3 0 31 3 0 74 3 0 143 3 0 174 3 0 236 3 0 *590 274 3 0 318 3 0 338 3 0 346 5 0 134 5 0 180 5 0 184 5 0 217 5 0 283 5 0 318 5 0 320 5 0 321 5 0 323 5 0 324 5 0 327 5 0 331 43 LOTS
RIVERTOP
OAKWOOD HILLS UNIT 7
7 A 4
7 A 5
7 A 21
7 A 22
7 A 26
7 A 27
7 A 28
7 A 29
7 A 30
7 A 31
7 A 32
7 A 33
7 C 9
7 C 11
7 C 21
7 C 22
7 D 3 7 F 21
7 F 22
7 I 18 7 I 30 7 N 24 7 Q 24 24 LOTS
APPENDIX B
MOUNTAIN RIVER
1 1 18 1 1 23 1 1 25 1 1 27 1 1 43 1 1 46 1 1 65 1 1 75 1 1 83 1 1 87 1 1 98 1 1 100 1 1 103 1 1 106 1 1 111 1 1 116 1 1 117 1 1 118 1 1 120 1 1 121 1 1 123 1 1 124 1 1 125 1 1 133 1 1 139 1 2 208 1 2 209 1 2 227 1 2 229 1 2 250 1 2 251 1 2 252 1 2 295 1 2 316 1 2 333 1 2 339 1 2 348 1 2 349 1 2 362 1 2 363 1 2 375 1 2 385 2 0 26 2 0 145 2 0 165 2 0 174 2 0 176 2 0 190 2 0 197 2 0 206 2 0 209 2 0 210 2 0 213 2 0 214 2 0 222 2 0 224 2 0 225 2 0 228 2 0 229 2 0 232 2 0 236 2 0 246 2 0 285 2 0 295 2 0 345 3 0 12 3 0 30 3 0 68 3 0 86 3 0 124 3 0 145 3 0 169 3 0 184 3 0 185 3 0 194 3 0 226 3 0 229 3 0 244 3 0 249 3 0 267 3 0 284 3 0 305 3 0 307 3 0 311 3 0 334 3 0 336 3 0 354 3 0 356 5 0 124 5 0 131 5 0 148 5 0 167 5 0 178 5 0 181 5 0 189 5 0 190 5 0 200 5 0 254 5 0 255 5 0 310 5 0 316 5 0 317 102 LOTS
APPENDIX C
1980 RIVERTOP AGREEMENTS FOR DEED
Contract
Date
Description of Lots
No.
Accepted
Involved
Purchaser
48002
5/23/80 Section 1, Lot 312
Murrill and
Brolsma
48003
5/23/80 Section 1, Lot 167
Tedrow
48004
5/23/80 Section 1, Lot 286
Lochia
48006
5/23/80 Section 1, Lot 31
Helms and
Hargett
48009
5/23/80 Section 2, Lot 159
Stiles
48010
5/16/80 Section 1, Lot 222
Eddie
48011
5/16/80 Section 2, Lot 207
Krueger
48012
5/16/80 Section 2, Lot 184
Wessinger
48013
5/16/80 Section 3, Lot 27
Notkin
48014
5/19/80 Section 1, Lot 252
Fishman
48015
5/19/80 Section 2, Lot 199
Hensley
48016
5/19/80 Section 3, Lot 143
Lloyd
48017
5/19/80 Section 3, Lot 162
Donella
48020
5/27/80 Section 3, Lot 346
Collins
48021
5/27/80 Section 3, Lot 274
Clay
48022
5/27/80 Section 3, Lot 122
Greene
48023
5/27/80 Section 3, Lot 121
Lukawitz
48024
5/29/80 Section 1, Lot 282
McIntyre
48026
5/29/80 Section 1, Lot 220
Bracken
48027
6/6/80 Section 2, Lot 147
Cable
48028
6/6/80 Section 3, Lot 74
Wagner
48029
6/30/80 Section 3, Lot 336
Gulino
48030
6/30/80 Section 3, Lot 236
Heinricks
48032
7/30/80 Section 1, Lot 160
Sexton
48033
8/31/80 Section 5, Lot 283
O'Hara
48034
9/8/80 Section 1, Lot 128
Shirey
48035
9/8/80 Section 1, Lot 26
Surratt
48036
9/8/80 Section 1, Lot 113
Blanton
48037
9/8/80 Section 1, Lot 114
Boyd
48038
9/17/80 Section 1, Lot 26
Watson
48039
9/17/80 Section 1, Lot 140
Harper
48040
not dated Section 3, Lot 318
Springer
or
notarized
48041
9/17/80 Section 1, Lot 112
Howell and
Hurt
48042
9/17/80 Section 1, Lot 109
Anders
48043
9/17/80 Section 1, Lot 136
Little
48044
9/19/80 Section 1, Lot 138
Lockaby
48045
9/22/80 Section 1, Lot 299
Flesvig
48047
9/22/80 Section 1, Lot 284
Repasky
48048
9/22/80 Section 1, Lot 361
Repasky
48050
9/23/80 Section 5, Lot 134
Batchelder
48051
9/24/80 Section 5, Lot 217
Pagliarulo
48052
9/25/80 Section 5, Lot 321
Bates
48053
9/25/80 Section 5, Lot 320
Carr
48054
9/25/80 Section 1, Lot 41
Medino
48055
9/25/80 Section 1, Lot 85
Smith
48057
9/26/80 Section 2, Lot 351
Robinson
48058
9/26/80 Section 1, Lot 92
Scarinzi
48059
9/26/80 Section 1, Lot 90
Scarinzi
48060
9/26/80 Section 1, Lot 386
Hoyle
48063
10/20/80 Section 5, Lot 335
Crawford
48064
10/23/80 Section 5, Lot 331
Hill
48065
11/10/80 Section 5, Lot 323
Cable
48066
11/18/80 Section 1, Lot 293
Layton
48067
11/21/80 Section 1, Lot 99
Smith
48068
12/18/80 Section 5, Lots 104,
N.C. Land 106 and 107
Investment
Co.
48069
12/18/80 Section 5, Lots 98,
N.C. Land 100, 116, 117 and
Investment 120 Co.
48070
12/18/80 Section 5, Lots 12,
Tish 20, 22, 25, 38 and 39
48071
12/18/80 Section 5, Lots 11,
Tish 13, 14, 15, 17, 18 and 19
48072
12/22/80 Section 3, Lot 338
Hallenbeck
48073
12/22/80 Section 5, Lot 184
Greenwood
48074
12/22/80 Section 1, Lot 275
Chow
48075
12/22/80 Section 5, Lot 180
Dubson
48076
12/23/80 Section 3, Lot 174
Capuozzo
*591 Description of Lots
Type of Contract or
Lots Listed on
Involved
Subsequent Events
Schedule A
Section 1, Lot 312
Contract reported as active
Yes
as of 12/31/81
Section 1, Lot 167
Contract cancelled by 8/1/80
No Section 1, Lot 286
Contract reported as active
Yes
as of 12/31/81
Section 1, Lot 31
Contract cancelled by 2/1/81
No Section 2, Lot 159
Exchanged by buyer on 8/6/80 for
No lot (Riverbend Section 1, lot
105) not on Schedule A - contract
cancelled by 2/1/81
Section 1, Lot 222
Contract cancelled by 9/1/80
No Section 2, Lot 207
Contract reported as active
Yes
as of 12/31/81
Section 2, Lot 184
Paid in full by purchaser and
Yes
deed issued 12/5/86
Section 3, Lot 27
Contract reported as active
Yes
as of 12/31/81
Section 1, Lot 252
Contract cancelled by 9/1/80
No Section 2, Lot 199
Contract cancelled by 2/1/81
No Section 3, Lot 143
Contract reported as active
Yes
as of 12/31/81
Section 3, Lot 162
Exchanged by buyer on 8/15/80
No for lot (Riverbend Section 3,
lot 31) on Schedule A - contract
cancelled by 8/31/85
Section 3, Lot 346
Contract reported as active
Yes
as of 12/31/81
Section 3, Lot 274
Contract reported as active
Yes
as of 12/31/81
Section 3, Lot 122
Contract cancelled by 10/1/80
No Section 3, Lot 121
Contract cancelled by 9/1/80
No Section 1, Lot 282
Contract reported as active
Yes
as of 12/31/81
Section 1, Lot 220
Contract cancelled by 2/1/81
No Section 2, Lot 147
Contract reported as active
Yes
as of 12/31/81
Section 3, Lot 74
Contracted reported as active
Yes
as of 12/31/81
Section 3, Lot 336
Contract cancelled by 9/1/80
No Section 3, Lot 236
Contract reported as active
Yes
as of 12/31/81
Section 1, Lot 160
Contract cancelled by 9/1/80
No Section 5, Lot 283
Exchanged by buyer on 1/28/83 for
Yes
lot not on Schedule A - contract
reported as active as of 12/31/81
Section 1, Lot 128
Contract cancelled by 10/1/80
No Section 1, Lot 26
Contract cancelled on 9/17/80 after
No buyer stopped payment on check
Section 1, Lot 113
Paid in full by purchaser and deed
Yes
issued 2/23/83
Section 1, Lot 114
Contract reported as active
Yes
as of 12/31/81
Section 1, Lot 26
Exchanged by buyer on 11/12/80 for
No lot (Riverbend Section 5, lot 324)
on Schedule A - paid in full by
buyer and deed issued 11/22/83
Section 1, Lot 140
Contract reported as active
Yes
as of 12/31/81
Section 3, Lot 318
Contract cancelled by 5/1/81
Yes
Section 1, Lot 112
Contract cancelled by 12/31/80
No Section 1, Lot 109
Contract reported as active
Yes
as of 12/31/81
Section 1, Lot 136
Contract cancelled by 11/1/80
No Section 1, Lot 138
Contract reported as active
Yes
as of 12/31/81
Section 1, Lot 299
Contract cancelled by 11/1/80
No Section 1, Lot 284
Contract reported as active
Yes
as of 12/31/81
Section 1, Lot 361
Contract reported as active
Yes
as of 12/31/81
Section 5, Lot 134
Contract reported as active
Yes
as of 12/31/81
Section 5, Lot 217
Contract reported as active
Yes
as of 12/31/81
Section 5, Lot 321
Contract reported as active
Yes
as of 12/31/81
Section 5, Lot 320
Buyer assigned contract to another
Yes
party on 1/23/85
Section 1, Lot 41
Paid in full by purchaser and deed
Yes
issued 2/23/83
Section 1, Lot 85
Contract reported as active
Yes
as of 12/31/81
Section 2, Lot 351
Contract reported as active
Yes
as of 12/31/81
Section 1, Lot 92
Contract cancelled by 12/31/80
No Section 1, Lot 90
Contract cancelled by 12/31/80
No Section 1, Lot 386
Contract cancelled by 3/1/81
No Section 5, Lot 335
Contract cancelled by 12/31/80
No Section 5, Lot 331
Paid in full by purchaser and deed
Yes
issued 10/1/82
Section 5, Lot 323
Contract reported as active
Yes
as of 12/31/81
Section 1, Lot 293
Contract cancelled by 7/1/81
No Section 1, Lot 99
Contract reported as active
Yes
as of 12/31/81
Section 5, Lots 104,
"House" sale - contract cancelled
No 106 and 107
by 4/1/81
Section 5, Lots 98,
"House" sale - contract cancelled
No 100, 116, 117 and
by 4/1/81
120
Section 5, Lots 12,
"House" sale - contract cancelled
No 20, 22, 25, 38 and
by 9/1/81
39
Section 5, Lots 11,
"House" sale - contract cancelled
No 13, 14, 15, 17, 18
by 7/1/81
and 19
Section 3, Lot 338
Contract reported as active
Yes
as of 12/31/81
Section 5, Lot 184
Paid in full by purchaser and deed
Yes
issued 2/23/83
Section 1, Lot 275
Contract reported as active
Yes
as of 12/31/81
Section 5, Lot 180
Contract cancelled by 8/30/82
Yes
Section 3, Lot 174
Contract cancelled by 7/1/81
Yes
*592 APPENDIX D
1980 MOUNTAIN RIVER AGREEMENTS FOR DEED
Contract
Date
Description of Lots
No.
Accepted
Involved
Purchaser
68000
8/21/80 Section 5, Lot 328
Knaack
68001
8/21/80 Section 5, Lot 309
Robey
68003
8/21/80 Section 1, Lot 375
Pareto
68004
8/21/80 Section 5, Lot 254
Martin
68006
8/25/80 Section 3, Lot 324
Bonacchi
68010
8/26/80 Section 1, Lot 250
Moore
68012
8/26/80 Section 3, Lot 227
Grassia and
Heffren
68013
8/27/80 Section 1, Lot 100
Clinkscales
68014
8/27/80 Section 3, Lot 30
Serbe
68016
8/27/80 Section 5, Lot 148
Wilson
68017
8/27/80 Section 5, Lot 127
Peace
68018
8/27/80 Section 2, Lot 209
Mason
68019
8/27/80 Section 2, Lot 26
Crisp
68020
8/28/80 Section 1, Lot 121
Benton
68021
8/27/80 Section 1, Lot 3
Sanchez
68024
9/8/80 Section 1, Lot 23
Quintana
68025
8/31/80 Section 3, Lot 329
Smith
68026
8/31/80 Section 5, Lot 328
Laine
68028
9/3/80 Section 5, Lots 189
Hice and 190
68029
9/3/80 Section 1, Lot 106
Hunter
68030
9/3/80 Section 1, Lot 124
Hughes
68031
9/3/80 Section 1, Lot 99
Bates
68032
9/3/80 Section 1, Lot 103
Taylor
68033
9/3/80 Section 1, Lot 98
Kissner
68034
9/9/80 Section 1, Lot 118
Jenkins
68035
9/9/80 Section 1, Lot 123
Jenkins
68036
9/9/80 Section 1, Lot 120
Sharp
68037
9/10/80 Section 2, Lot 345
Florez
68038
9/10/80 Section 3, Lot 68
Florez
68039
9/10/80 Section 1, Lot 140
Haus
68040
9/12/80 Section 1, Lot 386
Dominick
68041
9/15/80 Section 3, Lot 262
Favreau
68042
9/15/80 Section 1, Lot 116
Hrvol
68043
9/15/80 Section 1, Lot 131
Hill
68044
9/15/80 Section 1, Lot 125
Chavarry
68046
9/30/80 Section 5, Lot 322
Killian
68047
9/30/80 Section 1, Lot 117
Chandler
68049
10/1/80 Section 1, Lot 27
Humphries
68050
10/3/80 Section 1, Lot 65
Melton
68051
10/3/80 Section 1, Lot 139
Dover
68052
10/6/80 Section 1, Lot 83
Blackmon
68053
10/7/80 Section 3, Lot 187
Nagle
68054
10/7/80 Section 3, Lot 194
DiBiase
68055
10/8/80 Section 5, Lot 200
Green
68056
10/10/80 Section 5, Lot 255
Mitchell
68057
10/10/80 Section 3, Lot 336
Duffessy
68058
10/10/80 Section 3, Lot 185
Carhart
68059
10/14/80 Section 5, Lot 334
Ecord
68061
10/16/80 Section 1, Lot 274
Schooley
68063
10/17/80 Section 2, Lot 224
Cochrane
68065
10/20/80 Section 5, Lot 178
Netzley
68066
10/20/80 Section 5, Lot 316
Kenyon
68067
10/21/80 Section 1, Lot 163
Moran and
Rodriguez
68069
10/23/80 Section 2, Lot 281
Gaddis and
Jones
68070
10/23/80 Section 1, Lot 43
Rumbough
68071
10/23/80 Section 1, Lot 133
Austin
68072
10/23/80 Section 1, Lot 46
Stewart and
Harris
68073
10/23/80 Section 1, Lots 251
Barrinat and 252
68074
10/27/80 Section 3, Lot 22
LaRene
68075
10/27/80 Section 5, Lot 310
Salisbury
68076
10/27/80 Section 3, Lot 184
Strauss
68077
10/27/80 Section 1, Lot 75
Walker
68079
10/27/80 Section 1, Lot 87
Hinson
68080
10/27/80 Section 1, Lot 25
Jones
68081
10/27/80 Section 1, Lot 18
Faulkner
68082
10/30/80 Section 3, Lot 86
Moore
68083
10/30/80 Section 2, Lot 232
Viernes
68084
10/30/80 Section 1, Lot 234
Braun
68085
11/11/80 Section 1, Lot 318
Boesl and
Harmon
68086
11/11/80 Section 2, Lot 145
Greenig
68087
11/21/80 Section 1, Lot 385
Hill
68089
12/17/80 Section 2, Lot 308
Pierre
68090
12/17/80 Section 2, Lot 174
Krater
68091
12/17/80 Section 2, Lot 197
Siegel
68092
12/18/80 Section 1, Lot 335
Bellefond
68093
12/18/80 Section 3, Lot 124
Herring
68094
12/18/80 Section 2, Lot 228
Mize
68095
12/18/80 Section 2, Lot 225
Mitchum
68096
12/18/80 Section 2, Lot 190
Carrano
68097
12/18/80 Section 2, Lot 295
Dallenbach
68098
12/18/80 Section 2, Lot 236
Hernesilla
68099
12/18/80 Section 2, Lot 229
Levine
68100
12/18/80 Section 5, Lots 5,
Tish 6, 7, 9 and 10
68101
12/18/80 Section 5, Lots 41,
Tish 42, 43, 44, 45, 46 and 47
68102
12/19/80 Section 2, Lot 246
Thorpe
68103
12/19/80 Section 1, Lot 343
Bellefond
68104
12/19/80 Section 5, Lot 124
Reese
68105
12/19/80 Section 1, Lot 349
Massina
68106
12/19/80 Section 3, Lot 354
Hallenbeck
and Colby
68107
12/19/80 Section 2, Lot 206
Georgiou
68108
12/19/80 Section 3, Lot 229
Pine
68109
12/19/80 Section 3, Lot 226
Martinez
68110
12/19/80 Section 3, Lot 267
Loftis
68111
12/22/80 Section 1, Lot 333
Wheeler
68112
12/22/80 Section 1, Lot 339
Greenwood
68113
12/22/80 Section 1, Lot 208
James
68114
12/22/80 Section 1, Lot 348
Jones
68115
12/22/80 Section 2, Lot 176
Nilsson
68116
12/22/80 Section 2, Lot 165
Ferraiuolo
68117
12/22/80 Section 2, Lot 213
Largent
68118
12/22/80 Section 2, Lot 214
Aimi
68119
12/22/80 Section 3, Lot 307
Hart
68120
12/23/80 Section 3, Lot 169
Chagnon
68121
12/23/80 Section 3, Lot 311
Helsel
68122
12/23/80 Section 1, Lot 229
Joseph
68123
12/23/80 Section 1, Lot 227
Deihl
68124
12/23/80 Section 2, Lot 222
Powell
68125
12/23/80 Section 3, Lot 284
Jones
*593 Description of Lots
Type of Contract or
Lots Listed on
Involved
Subsequent Events
Schedule B
Section 5, Lot 328
Contract cancelled by 9/17/80
No Section 5, Lot 309
Contract reported as cancelled
No during 1980
Section 1, Lot 375
Contract reported as cancelled
Yes
during 1981
Section 5, Lot 254
Contract cancelled by 4/22/86
Yes
Section 3, Lot 324
Exchanged by buyer in 9/9/80 for
No lot (Riverbend Section 3, Lot
249) on Schedule B - contract
reported as active as of 12/31/82
Section 1, Lot 250
Paid in full by purchaser and
Yes
deed issued 4/19/82
Section 3, Lot 227
Contract cancelled on 9/8/80,
No with refund applied to Contract
No. 68011
Section 1, Lot 100
Contract reported as cancelled
Yes
during 1982
Section 3, Lot 30
Contract reported as active as of
Yes
12/31/82
Section 5, Lot 148
Contract reported as cancelled
Yes
during 1981
Section 5, Lot 127
Contract cancelled in 9/80
No Section 2, Lot 209
Contract reported as active as of
Yes
12/31/82
Section 2, Lot 26
Contract reported as active as of
Yes
12/31/82
Section 1, Lot 121
Paid in full by purchaser and deed
Yes
issued 3/29/82
Section 1, Lot 3
Contract reported as active as of
No 12/31/82
Section 1, Lot 23
Contract reported as active as of
Yes
12/31/82
Section 3, Lot 329
Exchanged by buyer in 9/80 for lot
No (Section 5, Lot 317) on Schedule B -
contract reported as active as of
12/31/82
Section 5, Lot 328
Contract cancelled in 10/80
No Section 5, Lots 189
Contract reduced in 1983 from
Yes
and 190
purchase of two lots to single
lot - contract cancelled by 9/86
Section 1, Lot 106
Contract reported as active as of
Yes
12/31/82
Section 1, Lot 124
Contract reported as active as of
Yes
12/31/82
Section 1, Lot 99
Contract cancelled by 9/80
No Section 1, Lot 103
Paid in full purchaser and deed
Yes
issued 6/14/83
Section 1, Lot 98
Contract reported as active as of
Yes
12/31/82
Section 1, Lot 118
"House" sale - contract subsequently
Yes
assigned to third parties - paid in
full by assignee and deed issued
6/3/85
Section 1, Lot 123
"House" sale - contract subsequently
Yes
assigned to third party - paid in
full by assignee and deed issued
6/3/85
Section 1, Lot 120
"House" sale - contract subsequently
Yes
assigned to third parties - paid in
full by assignee and deed issued
6/14/83
Section 2, Lot 345
Paid in full by purchaser and deed
Yes
issued 1/16/87
Section 3, Lot 68
Contract reported as active as of
Yes
12/31/82
Section 1, Lot 140
Contract cancelled in 9/80
No Section 1, Lot 386
Contract cancelled in 9/80
No Section 3, Lot 262
Contract reported as cancelled as
No of 12/31/80
Section 1, Lot 116
Paid in full by purchaser and deed
Yes
issued 5/19/81
Section 1, Lot 131
Contract cancelled by 12/80
No Section 1, Lot 125
Contract reported as active as of
Yes
12/31/82
Section 5, Lot 322
Exchanged by buyer in 10/80 for lot
No (Section 3, Lot 112) not on schedule
B - contract cancelled in 1/81
Section 1, Lot 117
Contract reported as active as of
Yes
12/31/82
Section 1, Lot 27
Contract reported as cancelled
Yes
during 1981
Section 1, Lot 65
Contract reported as active as of
Yes
12/31/82
Section 1, Lot 139
Contract reported as cancelled
Yes
during 1981
Section 1, Lot 83
Contract reported as active as of
Yes
12/31/82
Section 3, Lot 187
Contract cancelled by 10/80
No Section 3, Lot 194
Paid in full by purchaser and
Yes
deed issued 2/7/83
Section 5, Lot 200
Contract reported as active as of
Yes
12/31/82
Section 5, Lot 255
Contract reported as active as of
Yes
12/31/82
Section 3, Lot 336
Contract reported as active as of
Yes
12/31/82
Section 3, Lot 185
Contract reported as active as of
Yes
12/31/82
Section 5, Lot 334
Contract reported as active as of
No 12/31/82
Section 1, Lot 274
Contract cancelled by 12/19/80
No Section 2, Lot 224
Contract reported as active as of
Yes
12/31/82
Section 5, Lot 178
Contract reported as active as of
Yes
12/31/82
Section 5, Lot 316
Paid in full by purchaser and deed
Yes
to be issued as of 2/15/85
Section 1, Lot 163
Exchanged by buyer in 12/80 for lot
No (Section 3, Lot 12) on Schedule
B - contract reported as active as
of 12/31/82
Section 2, Lot 281
Contract cancelled by 12/80
No Section 1, Lot 43
Contract reported as active as of
Yes
12/31/82
Section 1, Lot 133
Contract reported as active as of
Yes
12/31/82
Section 1, Lot 46
Contract reported as active as of
Yes
12/31/82
Section 1, Lots 251
Contract reported as cancelled
Yes
and 252
during 1981
Section 3, Lot 22
Exchanged by buyer in 12/80 for more
No expensive lot (Section 1, Lot 295)
on Schedule B - paid in full and
deed to be issued as of 12/83
Section 5, Lot 310
Contract cancelled in 9/85
Yes
Section 3, Lot 184
Contract reported as active as of
Yes
12/31/82
Section 1, Lot 75
Contract reported as cancelled
Yes
during 1981
Section 1, Lot 87
Contract reported as active as of
Yes
12/31/82
Section 1, Lot 25
Contract reported as active as of
Yes
12/31/82
Section 1, Lot 18
Contract reported as active as of
Yes
12/31/82
Section 3, Lot 86
Paid in full by purchaser and
Yes
deed issued 12/22/81
Section 2, Lot 232
Contract reported as active as of
Yes
12/31/82
Section 1, Lot 234
Contract cancelled in 3/82
No Section 1, Lot 318
Contract cancelled by 12/80
No Section 2, Lot 145
Contract reported as cancelled
Yes
during 1982
Section 1, Lot 385
Contract reported as cancelled
Yes
during 1981
Section 2, Lot 308
"Great" program sale - contract
No cancelled in 3/82
Section 2, Lot 174
"Great" program sale - contract
Yes
reported as cancelled during 1981
Section 2, Lot 197
"Great" program sale - contract
Yes
reported as cancelled by 8/81
Section 1, Lot 335
"Great" program sale - contract
No cancelled in 8/81
Section 3, Lot 124
"Great" program sale - contract
Yes
reported as cancelled by 8/81
Section 2, Lot 228
"Great" program sale - contract
Yes
reported as cancelled during 1982
Section 2, Lot 225
"Great" program sale - contract
Yes
reported as active as of 12/31/82
Section 2, Lot 190
"Great" program sale - contract
Yes
reported as cancelled during 1981
Section 2, Lot 295
"Great" program sale - contract
Yes
reported as cancelled during 1981
Section 2, Lot 236
"Great" program sale - contract
Yes
reported as cancelled during 1981
Section 2, Lot 229
"Great" program sale - contract
Yes
reported as cancelled during 1981
Section 5, Lots 5,
"House" sale - contract cancelled
No 6, 7, 9 and 10
by 8/81
Section 5, Lots 41,
"House" sale - contract cancelled
No 42, 43, 44, 45, 46
by 6/26/81 and refund applied to
and 47
Contract No. 68100
Section 2, Lot 246
"Great" program sale - contract
Yes
reported as cancelled during 1982
Section 1, Lot 343
"Great" program sale - contract
No cancelled by 8/81
Section 5, Lot 124
Contract reported as active as of
Yes
12/31/82
Section 1, Lot 349
Contract reported as active as of
Yes
12/31/82
Section 3, Lot 354
Contract reported as cancelled
Yes
during 1981
Section 2, Lot 206
"Great" program sale - contract
Yes
reported as active as of 12/31/82
Section 3, Lot 229
"Great" program sale - contract
Yes
reported as cancelled during 1981
Section 3, Lot 226
"Great" program sale - contract
Yes
reported as cancelled during 1981
Section 3, Lot 267
"Great" program sale - contract
Yes
reported as cancelled during 1981
Section 1, Lot 333
"Great" program sale - contract
Yes
reported as active as of 12/31/82
Section 1, Lot 339
"Great" program sale - contract
Yes
reported as cancelled during 1982
Section 1, Lot 208
"Great" program sale - contract
Yes
reported as cancelled during 1981
Section 1, Lot 348
"Great" program sale - contract
Yes
reported as cancelled during 1982
Section 2, Lot 176
"Great" program sale - contract
Yes
reported as cancelled during 1982
Section 2, Lot 165
"Great" program sale - contract
Yes
reported as active as of 12/31/82
Section 2, Lot 213
"Great" program sale - contract
Yes
reported as cancelled during 1982
Section 2, Lot 214
"Great" program sale - contract
Yes
reported as cancelled during 1981
Section 3, Lot 307
"Great" program sale - contract
Yes
reported as active as of 12/31/82
Section 3, Lot 169
"Great" program sale - contract
Yes
reported as active as of 12/31/82
Section 3, Lot 311
"Great" program sale - contract
Yes
reported as cancelled during 1982
Section 1, Lot 229
"Great" program sale - contract
Yes
reported as active as of 12/31/82
Section 1, Lot 227
"Great" program sale - contract
Yes
reported as cancelled during 1982
Section 2, Lot 222
"Great" program sale - contract
Yes
reported as cancelled during 1981
Section 3, Lot 284
"Great" program sale - contract
Yes
reported as cancelled during 1982
*594 Footnotes
1. Cases of the following petitioners are consolidated herewith: Julian J. and Elizabeth M. Ferayorni, docket No. 15924-84; Milton and Hilda B. Werksman, docket No. 16846-84; Roger C. and Phyllis L. Zahn, docket No. 18945-84; Estate of Alan E. Kosh, June Kosh, Personal Representative, and June Kosh, docket No. 20114-84; Robert C. and Andree M. Zahn, docket No. 20208-84; Ronald I. and Gillian Ostrow, docket No. 21389-84; Harold S. and Paula Miller, docket No. 21391-84; Donald E. and Beverly Johnson, docket No. 21392-84, and Vinod and Ranjan Patel, docket No. 26815-84. Subsequent to filing his petition herein, Alan E. Kosh died on Jan. 7, 1986. By order of this Court dated Oct. 29, 1986, June Kosh, the duly appointed personal representative of the Estate of Alan E. Kosh, was substituted for the decedent.↩
2. All section references, unless otherwise indicated, are to the Internal Revenue Code, as amended and in effect for the taxable period in issue. All rule references are to the Tax Court's Rules of Practice and Procedure.↩
3. At trial, Investex's chief financial officer Michael Kramer estimated that over the years the company has made 30,000 retail contracts to sell the 1,500 lots in its Riverbend development.↩
4. The letters to Werksman and Johnson contained the following paragraph: An illustration of the economics of this investment (approximately) as it would apply to you is as follows: ↩
1980
1981-90
Total (10 yrs)
Partner's investment
$   30,000 $    -    $ 30,000    Taxable income (loss)
(100,000)
112,000  12,000    Tax savings (cost)
50,000 (56,000)
(6,000)   Cash distributions
500 40,000 40,500    Cash benefit (cost) to
the partner
20,500 (16,000)
4,500    5. In another part of the same offering memorandum the number of acres to be acquired in Oakwood by Rivertop was reflected as 18 rather than 29. ↩
6. In another part of the same offering memorandum the number of acres to be acquired in Three Top Mountain by Rivertop was reflected as 15 rather than 24.↩
7. The tax opinion stated the following: The State of Florida Division of Florida Land Sales and Condominiums has imposed certain restrictions on the transfers of the Oakwood Hills Property in which the Partnership is investing. Because of these restrictions the Partnership will acquire a beneficial interest in the Oakwood Hills Property but will not have a recordable interest. The Partnership will also acquire only a beneficial interest in the Property in North Carolina. The IRS may contend that the cash payment which the Partnership makes for the Property gives it an option to purchase the Property and not an interest as an owner of the underlying land. The IRS may argue that subsequent sales by the Partnership are sales of its interest in the option to acquire the land and not sales of the land itself. * * * It is our conclusion that the interest which the Partnership is acquiring in the land is significantly different and more than merely an option to acquire the property. * * * It is our conclusion that the rights of the Partnership in the Property will be the rights of an owner of an interest in real property and not merely the rights of a holder of an option. The total sales price of lots sold by the Partnership should include the debt which the Property secures and the Partnership should be a dealer in real property and record selling expenses accordingly, * * *.↩
8. The tax opinion included the following statement: If the accrual method of accounting is elected for reporting expenses, the Partnership will deduct all commissions attributable to a sale in the year of sale. If any property sold is re-acquired by the Partnership, the Partnership's obligation to pay commissions from the outstanding balance of the installment obligation will be terminated. The cancellation of this obligation to pay commissions is regarded as taxable income to the extent of the amount cancelled. * * *
9. See note 18 and the discussion of this Court's Jan. 12, 1987, order, infra↩, pp. 51-56.
10. See note 18 and the discussion of this Court's Jan. 12, 1987, order, infra↩, pp. 51-56.
11. The information contained in Appendix C includes: The date the contract was accepted by Investex; the section and lot numbers of the lots sold; the retail purchaser's name; certain subsequent events concerning the transaction as disclosed by Investex's records; and whether such lots sold are among the 67 lots listed in Appendix A, explained above in part A.
12. These 27 transactions are represented by contracts numbered: 48003, 48006, 48009, 48010, 48014, 48015, 48017, 48022, 48023, 48026, 48029, 48032, 48034, 48035, 48038, 48041, 48043, 48045, 48058, 48059, 48060, 48063, 48066, 48068, 48069, 48070 and 48071.↩
13. The information contained in Schedule D includes: The date the contract was accepted by Investex; the lot and section numbers of the lots sold; the purchaser's name; certain subsequent events concerning the transaction as disclosed by Investex's records; and whether the lots sold are among the 102 lots listed in Schedule B, explained above in part A.
14. These 27 transactions are represented by contracts numbered: 68000, 68001, 68006, 68012, 68017, 68021, 68025, 68026, 68031, 68039, 68040, 68041, 68043, 68046, 68053, 68059, 68061, 68067, 68069, 68074, 68084, 68085, 68089, 68092, 68100, 68101 and 68103.↩
15. Hirschhorn testified he used the information contained in the Investex 1980 annual time price report to prepare Mountain's return. Hirschhorn stated that in calculating the income to be reported by the partnership under the installment sale method, he utilized only the information on active sales transactions and ignored information from cancelled transactions. He elaborated that in his computations the interest or finance charge on each sale was included and not segregated. Hirschorn's actual computations were not shown on the partnership's return. While the partnership elected the installment method, $ 254,312 of gross receipts was reported. The $ 254,312 reported does not coincide with the collections stated on Investex's 1980 annual report to the partnership. The annual report indicates that there had been $ 105,881.83 of collections on active transactions and $ 8,867 of collections on cancelled transactions.
16. Hirschhorn testified he prepared the Rivertop partnership return in the same fashion as the Mountain return. See note 15, supra. Like the Mountain return, the Rivertop return does not show the actual computations made by Hirschhorn. The $ 156,496 of gross receipts reported on the return does not coincide with the collections reflected on Investex's 1980 annual report to the partnership; the annual report indicated that there had been $ 48,451.16 of collections on active transactions and $ 10,000 of collections on cancelled transactions.
17. In 1983, the Bernstein firm had been retained by Rivertop, Mountain, and several other Investex-organized partnerships to represent the partnerships following Investex's financial difficulties and failure to make remittances to each partnership. These partnerships, represented by the Bernstein firm, sued Investex and a lender of Investex. The partners of Rivertop and Mountain had retained the Bernstein firm on the advice and recommendation of the Schneider, Hirschhorn accounting firm. Zale Bernstein and each of the members of Schneider, Hirschorn were partners in Oakwood Hills Estate, a partnership which had engaged in a bulk sale transaction with Investex. Oakwood Hills Estates' accounting work had been done by Schneider, Hirschhorn. Additionally, Schneider, Hirschhorn rendered other services to the partnership. Investex's records show that all notices or communications from it to Oakwood Hills Estates were to be sent in care of Schneider, Hirschhorn. The Bernstein firm, prior to commencing the 1983 lawsuit against Investex referred to above, had also undertaken the representation before this Court of another individual who had participated in an Investex-organized partnership. A common defense fund to pay for that litigation had been established under the auspices of the Miami accountant Milton Sadoff. In that arrangement, Investex and the partners of other Investex-organized partnerships promised to help pay the costs of the tax litigation. In 1984, following the Internal Revenue Service's issuance of notices of deficiency to a number of individuals who had participated in the partnerships organized by Investex, the Bernstein firm sent letters to these individuals requesting they also make contributions to the common tax defense fund. In return for a contribution, the Bernstein firm would represent the individual contributor.
18. The following is an excerpt from the transcript of the Jan. 12, 1987, hearing: THE COURT: Are you telling me the * * * partners of Mountain River * * * don't know to this time which lots they were assigned? [Petitioners' attorney]: No, your Honor. They did get a list and I did provide that list as a separate page to Respondent, but it was not attached to the exhibit. It wasn't attached to the document. THE COURT: So the lots that you provided, the lot numbers, subdivision numbers or whatever you have provided to respondent are all the lots that the petitioners as partners of Mountain River * * * would have received in connection with their investment in the partnership. [Petitioners' attorney]: Correct. I received the one page which said they have 102 lots, the numbers were such and such. THE COURT: All right. And you gave that to respondent in connection with his discovery request? [Petitioners' attorney]: It was given, your Honor, but it was not attached to a document called sales agreement -- THE COURT: I understand, because the documents, you say, were received and signed without them. [Petitioners' attorney]: That is right, your Honor. * * * THE COURT: So far as you are concerned * * * there will be no surprises at trial. You will stay with the same position. In other words, your witnesses will testify that there were no schedules * * * attached to the original documents at the time they were executed, and that at some point in time which has not been identified, the general partners of Mountain River * * * were notified of the lots and you provided those lot numbers to the Respondent, but you are not able to tell the Respondent when the general partners became aware that those lots were the lots that they received. [Petitioners' attorney]: That is correct, Your Honor. I think the testimony will show when Investex assigned the lots to the partnerships. THE COURT: In other words, the partners still don't know when that occurred? [Petitioners' attorney]: No, your Honor. Petitioners' attorney made the same representations concerning the lots assigned to Rivertop. He specifically represented to the Court that inquiry had been made not only to his clients but to Rivertop's managing partner, Stanley Frankowitz. According to petitioners' attorney, the documents he obtained from Frankowitz had no schedule of lots attached. ↩
19. The following is an excerpt from the transcript of the Jan. 12, 1987, hearing: THE COURT: Let me see if I understand, before you get too far here. The general partners of Mountain River * * * in 1980, when this transaction was executed, completed or whatever, agreed to accept a computer print-out from Investex rather than receive an individual agreement for deed with respect to each lot * * *? [Petitioners' attorney]: Your honor, my understanding of what went on is the partnership was getting initially agreements for deed. They felt it was too cumbersome, that the computer runs from Investex would be sufficient to show all the information as to the sales that were current. THE COURT: All of the ones that you have turned over, the two-thirds that [respondent's counsel] referred to, are they all the ones you had? [Petitioners' attorney]: No, your Honor. We didn't have any at all. THE COURT: You didn't have any of them? [Petitioners' attorney]: I went to Investex, requested in writing; a copy of the letter I sent to Investex in October I gave to [respondent's counsel]. I requested of Investex all the agreements for deed they have. This goes back to 1980. Investex has moved since 1980. They provided me with those documents. They told me at the time those weren't all of them, but those were all they had. THE COURT: Getting back to Mountain River * * * though, your response to the Respondent with respect to the agreements for deed requested * * * is that at some point in time, * * * Mountain River * * * no longer acquired or maintained agreements for deed, they only had the computer print-outs? [Petitioners' attorney]: Correct, your Honor. THE COURT: What happened to the agreements for deed that were initially received? They are not around any more? [Petitioners' attorney]: From my understanding of talking to the people who received them, they did not keep them since they were getting the computer runs. They were getting the computer runs monthly. THE COURT: They might have thrown them out or sent them back to Investex; you don't know? [Petitioners' attorney]: They may have, your Honor. Your Honor, what we intend to do in terms of trial, we have requested and I have subpoenaed already, and it is something we are going to discuss later, the Investex books and records, which will show what went on, all the sales, but we don't have any agreements of deed other than what I have given to respondent. Petitioners' attorney made the same representations as to Rivertop's agreements for deed.↩
20. More specifically, each partnership took the following deductions: ↩
Rivertop--
Selling expenses
$  90,000
Commission expenses
683,077
Bank charges
29
Total Deductions
$ 773,106
Mountain River--
Selling expenses
$   138,000
Commission expenses
1,002,173
Bank charges
27
Total Deductions
$ 1,140,200
21. It is doubtful that the "house" sales (allegedly made for Rivertop and Mountain) were bona fide transactions. In each of the "house" sale transactions, the contract was subsequently cancelled and the amounts "paid," plus interest, refunded. At trial, Leonard Atlas claimed the lots he purchased were particularly desirable and that he believed his son-in-law would make a considerable profit from owning them. Yet, by Sept. 1981, Atlas had cancelled the contracts. The record further shows the refunds were made to Atlas, not to his son-in-law. This aspect of Atlas's testimony is unbelievable.
22. The record also shows that Miller, prior to becoming a partner in Rivertop on Mar. 28, 1980, discussed the partnership offering with Alan Schneider. Miller's notes of that conversation reflect that Schneider had assured Miller -- notwithstanding the cautionary statements to the contrary in the offering memorandum -- that Rivertop's partners would not have to make additional capital contributions beyond their initial investments and that all of Rivertop's lots would be sold in 1980. ↩
23. Certain other aspects of Hirschhorn's testimony are worthy of note. When asked about the statement in the Mountain 1980 Financial Highlights letter that all the partnership's land had been successfully sold, Hirschhorn claimed such was "fact." Yet, it was represented to this Court by petitioners' former counsel that initially each partnership received at least some of the 1980 agreements for deed. Under each partnership's representative agreement, copies of the retail contracts made each month were to be submitted to the partnership. All written notices and communications to each partnership were to be sent by Investex in care of Schneider, Hirschhorn. Some of the early retail contracts were, in fact, for lots not listed on the Rivertop and Mountain lot schedules. Hirschhorn, while testifying that the schedules were given to him within about a week of the date of each partnership's agreements with Investex, was silent about whether he noticed this discrepancy between the lots sold under the early agreements for deed and the scheduled lots. Conveniently for him and the other members of his firm, despite their accounting training, we are told that none of the retail contracts were retained by the partnerships. In short, we have found Hirschhorn's testimony not only questionable, but upon reflection evasive and less than forthright.
24. The following is an excerpt from the trial transcript concerning Frankowitz's testimony on this point: Mr. Fuerst: Do you recall, at the time that you signed these documents, whether there was a document called an Exhibit A, a list of property lots that was being sold to Rivertop? Frankowitz: Yes. Mr. Fuerst: Was there one there? Frankowitz: What you just now showed me? Mr. Fuerst: No, attached to the sales agreement. Frankowitz: I believe there was. Mr. Fuerst: Did they tell you that that was a sample, or did they tell you -- what did they tell you about that list? Frankowitz: That these were the lots that were to be sold by this company. * * * Respondent's counsel: Your honor, I think we'd like to object to the testimony regarding attachment Exhibit A, because the parties stipulated that Exhibit A was not attached, that no Exhibit A was attached to the document at the time. * * * The Court: Before you start [addressed to counsel for respondent], I would ask Mr. Fuerst, what does it mean now that this witness testified that there is an Exhibit A at the time he signed it, and the parties have stipulated there was [not]. Is this what Petitioner is going to argue, or what? Mr. Fuerst: No, it doesn't mean that at all. What I understood was that there was a proforma created at the beginning, which was based upon Mr. -- The Court: I don't want to hear all that. Mr. Fuerst: I've been waiting for someone to get me a sample, and he may have seen a sample. But that clearly was not the Exhibit A that finally ended up; it couldn't be. So I wouldn't argue from his testimony. I wouldn't vary from the stip, because the stip is fact that I know to be true. The Court: So why did you ask the question? Mr. Fuerst: I've been looking for a sample Exhibit A. The Court: All right [to respondent's counsel], you may cross-examine. Before you begin * * * my understanding is that the agreement of the parties is the fact for the purposes of this case. Petitioners' counsel's reference to a possible sample list was only conjecture upon his part. The Rivertop offering materials which were stipulated into evidence, contain no sample list. His speculation was apparently based on some earlier testimony given by Investex's chief financial officer Michael Kramer. Kramer stated that the earlier partnership offerings made -- not necessarily those of Rivertop and Mountain -- did have offering materials which contained sample lists of lots for illustrative purposes. He further claimed that Investex never retained such sample lists as part of its records and workpapers, although he also stated that the sample list would be the starting point from which the actual list of lots assigned the partnership would be compiled. 25. In his testimony, Birenbaum asserted that within 6 or 7 months after he joined the company in 1979, Investex had decided to temporarily cease selling lots in the Three Top Mountain development. He claimed the offering memorandum's reference to acquisition of Three Top Mountain lots had been an oversight of Investex's chief executive officer, Martin Rothman. Rothman, Birenbaum stated, handled the company's prospective bulk sale transactions and thus reviewed the offering materials for each. Since Rivertop's offering materials were based on similar materials used in prior offerings, Rothman, he asserted, had forgotten to delete the discussion concerning the acquisition of Three Top Mountain lots. Rothman did not testify at trial. Were we to accept Birenbaum's explanation, it would follow that Rothman was not particularly concerned about which specific lots his company had contracted to sell Rivertop.↩
26. Robert Birenbaum (Investex's senior vice president) stated that Investex paid the real property taxes and did not seek reimbursement from the partnerships. He explained that each partnership was obligated to repay Investex, but that the taxes were nominal and his company did not bother to bill the partnerships. In actuality, we think Investex did not seek payment because it was unsure which lots, if any, would ultimately be assigned to each partnership.↩
27. Respondent has not argued that any portion of the amounts paid this subsidiary for development work would be nondeductible capital expenditures.↩